Russell *v.* Russell.

LOTTIE R. RUSSELL

*v.*

·BENJAMIN RUSSELL et al.

[Filed August 16th, 1900.]

1. Where an agreement in writing is complete on its face, and purports to contain the entire agreement of the parties, parol proof of another term will not be received, although the written contract may contain nothing on the subject to which the parol proof is directed.

2. In such cases the completeness of the written agreement will be ascertained from the agreement itself.

3. Parol proof offered to charge any person on any contract in consideration of marriage, cannot be received, whether the matter offered is the proof of a single term of an agreement or of the whole contract. The rule is the same in equity as at law. The operation of the statute of frauds cannot be avoided by a mere change of the forum of litigation.

4. Equity will, where special equitable grounds are shown, give relief notwithstanding the statute, as in cases of part performance of parol contracts, where the party seeking to enforce has so changed his position that to apply the statute would be to aid rather than to prevent a fraud.

5. The fact that the party whom it is sought to charge has done some act of part performance of the parol contract, is no reason for such equitable relief.

6. Where a contract is made in consideration of marriage, it is thereby brought within the operation of the statute, and cannot be enforced if made by parol. The subsequent marriage cannot be set up as a part performance to take it out of the statute.

7. The relations between persons engaged to be married are confidential. The intended husband may not, either by contrivance or omission, obtain an agreement before marriage which deprives the intended wife of so much of the benefit which she would have obtained by the marriage that it is reasonable to believe she was misled into making the antenuptial agreement. If it is shown that it does have this effect, the burden is upon the representatives of the husband to prove that she acted with knowledge of the sacrifices which she made.

8. The burden of proof is upon the wife to show the existence of the gross disproportion which requires explanation from the representatives of the husband. It is only when this is established that the burden shifts. If the wife fails to show the existence of the disproportion, no obligation to explain is cast upon the representatives of the husband. If it is not shown that she loses anything by the ante-nuptial agreement, there is no occasion to believe she was misled.

Russell *v.* Russell.

9. In New Jersey the wife acquires by marriage only an inchoate right of dower, and no interest in her husband's personalty. The comparison to ascertain whether a disproportion exists must, in this state, be made between the values secured to the intended wife by the ante-nuptial agreement and the value of her dower right.

On bill, answer and proofs.

The complainant in this bill is the widow of John Russell, deceased, late of Cumberland county, New Jersey, to whom she was married on the 13th day of November, 1892, and who died on the 20th day of July, 1897, testate, leaving him surviving the complainant, his widow, who had borne him no children, and leaving as his next of kin his three minor grandchildren, issue of his first wife. He also left three nephews.

The complainant, at the time of her marriage to Mr. Russell, was a widow, fifty years of age, having adult children by her former marriage. She resided at Port Elizabeth, in Cumberland county, about four miles from Leesburg, where Mr. Russell lived. He was a widower of about seventy-five years of age. The complainant had known Mr. Russell for several years, and had been engaged to be married to him for about four months before their marriage.

She alleges in her bill of complaint that Russell was possessed of real and personal property worth $250,000 at the time they became engaged; that she was not aware of the nature or value of his estate, but knew that he had the reputation of being a man of means; that after they became engaged, Mr. Russell told her that because of the unsettled condition of his business and affairs there might be delay in settling his estate, and without stating the nature or value of his estate, proposed that $15,000 should be provided for her, payable within six months after his death, to provide for her individual wants, and that in addition thereto he would provide for her liberally by his will, to which the complainant assented, saying she left to him to do entirely as he wished.

That afterwards he proposed that the sum be made $10,000, and to make a liberal provision for her in his will, to which she also assented, declaring "she was willing that he should do what-

ever he thought best." That shortly after this the complainant received a draft of an agreement which she saw reduced the provision for her to $5,000. Mr. Russell called her attention to this change, and explained that his affairs were in such shape that to secure her the larger sum would seriously inconvenience his executor; that $5,000 was enough for her immediate wants, and that in addition thereto he would provide for her liberally in his will. To which complainant assented without objection or suggestion, replying that she felt he would do what was right, and would carry out his promise, and having confidence in him, would leave the matter to him to be arranged as he thought best.

She alleges that she signed the proposed agreement for the payment to her of the $5,000, relying on his promise to provide liberally for her in his will, and that it was at once delivered to the trustee named therein, and that no copy of the agreement was furnished to her. That she had no advice of counsel, and was ignorant of the effect of the agreement. She further alleges that she never asked her husband to make a will, according to their alleged agreement, and did not know until after his death that he had made one. That the marriage agreement was never referred to during their married life. That she never inquired into the nature or value of his estate, and knew nothing of it until after his death.

She further states that Mr. Russell did, while they were on a visit to Florida, in February, 1896, make his will, in which he left her the $5,000 named in the ante-nuptial agreement, and also ten shares of Glassboro bank stock, of par value of $1,000, and gave all the rest of his estate to his grandchildren and his nephews and other legatees and devisees. This will was duly proven on July 31st, 1897, and by an inventory and appraisement the personalty was valued at $89,727.66, but that it was in fact of much greater value, and he also died seized of real estate of the value of over $100,000, and that at the time of making the ante-nuptial agreement his estate was as great in value as at the time of his death.

After the testator's death, the complainant accepted from the trustee a partial payment of $500 under the ante-nuptial agreement. This she alleges was in ignorance of her rights, and that

she has refused to receive any further portion, though she admits the executor was willing to pay and deliver to her the $5,000 and the bank stock.

She charges that Mr. Russell violated his agreement with her in that he did not make a liberal provision for her in his will. That he procured the ante-nuptial agreement from her by fraud; that his executors, devisees and legatees should perform his agreement by making a liberal provision for her, which she insists should be in excess of the total amount which would have come to her by operation of law had Mr. Russell died intestate. She tenders herself ready to release her dower and other interests in Mr. Russell's estate, on fulfillment of the agreement.

She makes the executors, devisees and legatees of Mr. Russell, defendants, and prays discovery of the whole estate, an accounting for the same, and that the written ante-nuptial agreement may be decreed to be void, and be canceled; that the defendants may be decreed specifically to perform the agreement of Russell to make a liberal provision for her; that she may be declared to be entitled to receive the sum of $4,500 and also a liberal provision, not less than one-third of the personalty, and also the value of her dower rights in the realty, upon her giving a proper release of her dower right and other interest in the estate; that the decedent's will may be decreed to have been made in fraud of the testator's agreement with the complainant, and to be null and void, in so far as the distribute share of the complainant in the personalty of the decedent is concerned.

There is also a prayer for an injunction restraining the defendants from disposing of the decedent's property. Copies of the ante-nuptial agreement and of the will are annexed to the bill.

The executor and principal devisees and legatees file litigating answers, admitting the marriage and the will, but denying that the decedent was possessed of $250,000 worth of property when the ante-nuptial agreement was made, or at the time of his death. They profess their willingness to comply with the terms of the ante-nuptial agreement, allege that the complainant accepted $500 under it, and deny that she did so in ignorance of her rights, as alleged in the bill. They deny that Russell agreed

to make a liberal provision for the complainant in his will, deny that he has violated any agreement with her, and that he fraudulently procured her to sign the ante-nuptial agreement. They also deny the equity of the bill and they ask the same benefit as if they had demurred to the bill.

The infant defendant legatees by their guardian file answers praying that their interests may be protected.

The cause is at issue, and has come to a hearing on its merits.

*Mr. Benjamin J. Downer* and *Mr. Clarence S. Brown* (with whom was *Col. Robert G. Ingersoll,* of the New York bar), for the complainant.

*Mr. Walter H. Bacon* and *Mr. David J. Pancoast,* for the defendants.

GREY, V. C.

The complainant admits that the ante-nuptial agreement which she entered into with Mr. Russell in his lifetime, was made in consideration of their marriage. The contract produced is all in writing, and is signed by the parties to be charged therewith. The complainant does not deny its execution and delivery by her and Mr. Russell. Her claim for relief is based upon two several grounds—*first,* she contends that the written agreement is not complete in that it does not contain an undertaking by Mr. Russell to make for her a liberal provision in his will, which, she insists, was a part of their ante-nuptial agreement; *secondly,* that she was induced to enter into it by the fraudulent statements of Mr. Russell to the effect that he would, in addition to the provision for her in the contract, make a liberal provision for her in his will, and by his omission to inform her of the extent and value of his property at the time of the making of the agreement.

The defendants deny that there was any other or additional agreement than that expressed in the writing, and insist that the complainant's contention that the written agreement may be supplemented by parol proof of an additional term, whereby the consideration to be paid would be increased, cannot be considered.

It is an established rule of evidence in this state that where the written contract is complete on its face and purports to contain the entire agreement of the parties, parol evidence will not be received to add another term to the agreement, although the written contract may contain nothing on the subject to which the parol evidence is directed, and that the completeness of the written contract is to be ascertained from the contract itself. *Naumberg* v. *Young, 15 Vr. 331; Bandholz* v. *Judge, 33 Vr. 526.* This rule is recognized and enforced in equity as well as at law. *McTague* v. *Finnegan, 9 Dick. Ch. Rep. 460; Van Horn* v. *Van Horn, 4 Dick. Ch. Rep. 328 (Court of Appeals).*

The written contract now under consideration appears to be complete and perfect in all its parts, and to provide for the complainant a compensation which is entire and final. The complainant seeks by parol proof to show that Mr. Russell agreed to pay a compensation in addition to that stated in the written contract for the same service therein agreed to be rendered. The rule quoted prohibits the reception of such evidence.

The statute of frauds also interposes an insurmountable bar to the admission of parol proof seeking to charge any person upon any contract made in consideration of marriage. That the consideration of this contract was an intended marriage is undisputed. The contention of the complainant is therefore directly in the face of the statute, which is just as prohibitive in such cases, of the addition of a single parol term to a written agreement, as it is to the enforcement of a contract resting wholly in parol. Courts of equity refuse to entertain suits for enforcement of such contracts, unless special equitable grounds be shown which justify the giving of relief, notwithstanding the statute.

Equity will grant relief where specific performance is sought of parol contracts, though their enforcement is prohibited by the statute of frauds, in cases where the party seeking performance has been induced partly to perform the parol contract. This right to relief is based upon the fact that to apply the statute, would, in view of his changed position, aid rather than prevent a fraud. But acts of part performance by the party

sought to be charged cannot be set up as a reason for the exceptional action of this court in refusing to apply the statute. It is not his change of position, but that of the other party, induced thereto by the parol contract, which makes the case one of hardship and injustice.

This is well illustrated by Lord Chancellor Cranworth in *Caton* v. *Caton, 1 Ch. App. Cas.* *148, in a cause which, in all of the essential facts that call for the application of the statute of frauds to prohibit the enforcement of the alleged parol contract, is similar to that now under examination. There was a parol agreement that in consideration of marriage the husband would make a will giving the intended wife all of her own, and also some of his property. The marriage took place, and the husband made a will accordingly, but afterwards made a different will. The wife, after his death, filed her bill to enforce the parol contract, alleging her marriage as the element of part performance which should take the case out of the statute. But Lord Chancellor Cranworth held that though marriage is necessary to bring a case within the statute, to hold that it also takes it out of the statute would be a palpable absurdity. He further declared that it is certain that marriage itself is no part performance within the rule of equity.

In this his lordship's judgment followed *Montacute* v. *Maxwell, 1 P. Wms. 620,* and *Lassence* v. *Tierney, 1 Macn. & G.* *571, and it has been accepted in this court in *Manning* v. *Riley, 7 Dick. Ch. Rep.* 44. He further declared that the execution of the will by the husband caused no alteration of the position of the lady, save in the fact of her marriage, which, as above stated, could not be held to be such a performance as took the parol agreement out of the statute, and that "it will not be argued that any consequence can be attached to acts of part performance by the party sought to be changed," following this with a very apt illustration. In the present case there is no pretence that the complainant has done any act of part performance of the parol contract which she seeks to have enforced, save only the single incident of her marriage.

The weight of authority is against the claim of the complainant that it may be shown that the written agreement does not

Russell *v.* Russell.

fully and exclusively express the ante-nuptial contract, and that she may supplement it by parol proof of another term.    Her contention on these points cannot be sustained.

The relief which the complainant claims to have by a decree enforcing the alleged parol promise of Mr. Russell that in addition to the benefits secured to her by the written agreement he would make for her a liberal provision in his will, is necessarily dependent upon the parol proofs by which she offers to establish that promise.    When those parol proofs may not be considered, all possibility of any relief by decree for the specific performance of any such contract is destroyed.    It is unnecessary therefore to discuss the contention of the complainant that an agreement to make a "liberal provision in a will," can be enforced by a court of equity.    No authority was cited in which a contract so uncertain in its terms, and so dependent upon the individual view of the person making the agreement, has been enforced.    In every day's experience of life, what one person considers to be a liberal provision, is by others deemed under the circumstances to be niggardly.    If the question of what amount of Mr. Russell's estate should be decreed to be a liberal provision for his wife were to be considered, it would be fraught with embarrassment because of the lack of those elements of certainty which judicial determination requires.

The second ground upon which the contract is attacked is that the complainant was induced to enter into it unadvisedly by the fraudulent statement of Mr. Russell, and by his omission to inform her of the extent and value of his property.

If this contention of the complainant should be sustained, it would still be no ground for a decree for the specific performance of the alleged parol contract that a liberal provision should be made for complainant.

The most conclusive showing that she was by fraud induced to make an agreement which is proven, cannot justify a decree that a different agreement which is not proven, shall be specifically enforced.

If it shall appear that Mr. Russell did by fraudulent artifice induce her to° make the ante-nuptial agreement, and that the complainant so asserted her rights that she is entitled to redress,

19

her relief must come, if at all, by a decree setting aside the written agreement and declaring it to be wholly void, because of fraud practiced in obtaining it. This determination would not give to the complainant any distributive share in the personalty of the decedent as if he had died intestate. His will must stand as a disposition of his personal estate. He always had unlimited power to dispose of that as he chose. She would secure a dower right in her late husband's lands. The real estate is in such great portion unimproved and unproductive that it may be doubted whether such a decree would be of more value to the complainant than the acceptance of the amount absolutely payable to her under the ante-nuptial agreement. The cause has been argued upon her part with energetic insistence that there should be a decree for the specific performance of the alleged parol contract that Mr. Russell would make for her a liberal provision in his will. As above shown, this cannot be granted.

The prayer of the bill asks that the written agreement may be decreed to be void, but apparently as a basis for the immediately following prayer for the specific performance of what the complainant insists was the entire ante-nuptial contract, which includes the terms of the written agreement and the added term for a liberal provision in the will, which the complainant contends should be enforced. Argument was, however, submitted claiming that the ante-nuptial agreement should be decreed to be void because of alleged fraud on the part of Mr. Russell in obtaining it, and in order to dispose of all the matters in issue, this phase of the case should be considered.

In charging that Mr. Russell perpetrated a fraud for which the written ante-nuptial agreement should be declared void, the complainant does not claim there was any misrepresentation to her of the contents of the paper, nor that she executed one instrument believing it to be another. Both the bill of complaint and the evidence show that the proposed agreement, as it now appears, had been a subject of conversation between the parties on several occasions previous to its execution, and that the amount of money to be secured by it to the complainant was, with her assent, several times reduced, and was finally fixed at the sum

of $5,000, which is now in the agreement. None of its other terms are challenged because alleged to be different from those which the complainant supposed it contained. The complainant does not contend that it was represented to her that the written agreement contained a clause obligating Mr. Russell to make a liberal provision for her in his will. This matter she claims was a separate and parol promise made by Mr. Russell, and was additional to those things which, by the written contract, he undertook to do, though for the same consideration—marriage. For her assurance that Mr. Russell would make the liberal provision, &c., it is entirely clear the complainant relied wholly upon the parol promise of Mr. Russell. This is the precise illustration used by Lord Chancellor Parker so long ago as 1720, to show that no relief can be given in equity in such a case, against the prohibition of the statute of frauds. *Montacute* v. *Maxwell, 1 P. Wms.* *620. Standing purely on a parol promise before marriage, there is no color to relieve the plaintiff. *S. C., 1 Str.* *237.

The proven and undisputed actions of Mr. Russell at and before the making of the ante-nuptial agreement, though related in great part in the testimony of those adverse to his estate, not only fail to show any fraudulent design, but they actually indicate a fair minded purpose to deal with his intended wife in a frank way, to secure to her such a provision as he was willing to give, and she was willing to accept. It must be remembered that in 1892, when this agreement was made, he was seventy-five years of age, and she was an elderly widow—over fifty—with sons twenty-three and twenty-five years old. He had already accumulated his fortune without her aid, and she had comparatively nothing. He had issue who might reasonably expect to receive his considerate remembrance. Her sons would retain the first place in her thoughts, as there was no probability that any children would be born of the marriage. From her point of view the provision made for her by the written agreement lifted her out of penury, gave her a home, and the enjoyment with Mr. Russell of his fortune during his life, and secured her a comfortable maintenance and the absolute disposal of at least $5,000 after his death, and a possible further provision for her in his will.

His point of view in arranging the agreement was probably that which would be taken by a man, who, by patient care and persistent petty· saving had accumulated such property as in the remoter country districts is deemed to make one wealthy. He desired the society and housekeeping services of a capable and estimable wife, and he wished to avoid the annoyances incident to his wife's signature and acknowledgment of his deeds.

The testimony as to the origin of the agreement is largely that offered on the part of the complainant, her own son being her most prominent witness.

The agreement was, as finally submitted, in typewriting, two copies being prepared. Mr. Russell does not appear to have hastened the making of it or to have brought it and secured its execution in his presence. The complainant alleges that she had no copy, but her son testifies that she received a copy through the mail, and handed it to him to read. It was afterwards, the son says, discussed by Mr. Russell and his mother in his presence. There was therefore no attempt on Mr. Russell's part at secrecy, and abundant time was afforded for examination, consideration and deliberate judgment. The son says he declined to advise his mother as to the making of the agreement, and told her that it was a matter for her decision if she was satisfied that Mr. Russell would do as he represented, and keep his agreement referring to the liberal provision in his will. The weight and credibility of the evidence leads me to the conclusion that both the complainant's sons and herself fully discussed the advisability of entering into this agreement before she made it. The son who was sworn testified that his mother handed this agreement to him to read, and it was proven that after Mr. Russell's death this witness admitted that previous to the signing of the agreement he and his brother both advised his mother on the subject of signing it; that his brother thought she should sign it, and that he had advised her not to do it. The brother was not called as a witness. The son denied this admission, but his manner in the denial was not satisfactory of his truthfulness, and the statements of the witness who contradicted him stand so consistently with the undisputed facts of their interview, that I am satisfied the son did make the admission, and that the

agreement was in fact carefully examined and discussed by the complainant and her sons, and accepted with a full understanding of its true significance. Its terms are so simple, clear and distinct to show that the complainant would by the marriage acquire no additional interest in Mr. Russell's estate, save such as he might give her by will, that it is impossible to believe that she expected after executing it to have anything from him beside that which was provided in the agreement.

It is claimed that she acted in ignorance of the extent and value of Mr. Russell's estate; that he was bound before she made such an ante-nuptial agreement to inform her in detail of the nature and value of the different pieces of land he owned, and of the personal property which he possessed.

There is no proof that she executed the agreement without knowledge of the extent and value of his property, but the complainant strenuously insists that the burden is upon those standing in Mr. Russell's place, affirmatively to prove that she had knowledge, and that upon failure to make such proof, the agreement must be held to have been fraudulently obtained and to be void. Several cases are cited to the effect that parties engaged to be married occupy a confidential relation, and that where the provision for the intended wife is disproportioned to the means of the intended husband, it raises a presumption of designed concealment, which obliges those who would sustain the agreement to prove that the intended wife had knowledge at the time the agreement was executed of the character and extent of the husband's estate. *Kline* v. *Kline, 57 Pa. St. 120; S. C., 64 Pa. St. 122; Pierce* v. *Pierce, 71 N. Y. 154; Hessick* v. *Hessick, 169 Ill. 486.*

The principle that those who are pledged to marry occupy a confidential relation, and that their contracts are not to be considered to have been made "at arm's length," is well established. The language of the decisions is sometimes lacking in precision, and in several cases is so expressed that they appear to hold that a presumption of unfair dealing will arise when it appears that the ante-nuptial provision for the wife is out of proportion to the value of all the property which the husband possesses. If this implies that in order to save himself from an imputation

of fraud in entering into an ante-nuptial agreement, a man must secure to his intended wife a fair proportion of all his property, whether she would by his marriage receive such proportion or not, I cannot accept it as a reasonable statement of his duty. His relation to his fiance is such that he is bound to deal fairly and candidly with her in the making of an ante-nuptial agreement, but there is no obligation upon him to secure to her any proportion, due or otherwise, *of all his property,* under the penalty that if he does not, their agreement must be decreed *prima facie* a fraud upon his part. The principle of fair dealing which underlies all these decisions on the subject is this: The intended husband may not by either contrivance or omission obtain an agreement before the marriage which deprives the intended wife of so much of the benefits which she would obtain by the marriage, that it is reasonable to believe she was misled into making the agreement. If it is shown that the agreement does deprive the wife, such proof, when considered with the fiduciary character of the husband's relation to the wife, will impose upon the husband or those standing in his place the burden of proving that in making the sacrifice of the values which she resigned, she acted with full knowledge of them.

This condition of so great a variance in value between what is secured to the intended wife by the ante-nuptial agreement, and what she would get by her marriage, is a matter of evidence to be proven by the party who asserts it. No presumption will be raised that such a variance exists. It is only when this variance has been established by sufficient evidence that there is any reason to believe that the intended wife has been misled. It is only then that the burden of proof shifts, and obliges the representatives of the husband to prove affirmatively that she was fully informed by him of the nature and extent of the property in which she might, by her marriage, have acquired an interest.

In considering the evidence offered to establish this condition of variance, which must be so great that it suggests a belief that the wife was misled, it will be found that the cases in which the rights of the wife, against the representatives of the deceased husband are most easily upheld, are those which have been decided in jurisdictions whose laws give to the wife by her mar-

riage the largest interest in her husband's estate, for it is with that interest that ante-nuptial contracts usually deal. In Illinois, for instance, the variance necessary to raise the presumption is much more readily shown than in New Jersey, for under the law of the former state the wife acquires by the mere fact of marriage and survivorship, not only her one-third dower interest in her husband's lands for her life, but also an absolute ownership in one-third of his personalty. *Hessick* v. *Hessick, 169 Ill. 493.*

In this state, the wife acquires by marriage simply a dower interest in one-third of the husband's lands during her life. The fee-simple of all his lands, subject to her dower right, and the entirety of all his personalty, remain at his uncontrolled disposal, as fully after as before marriage.

Accepting the principle above stated that the burden of showing that the wife acted with knowledge, is cast upon the husband only when the amount secured to her by the ante-nuptial agreement, is out of all proportion to that to which as a wife she would be entitled, the comparison in this state, to ascertain whether the complainant has shown such an unconscionable variance, must be between the amount secured to the intended wife by the ante-nuptial agreement and the value of her dower right in her husband's lands, which is all she would acquire in this state by the marriage.

The wife's possible interest in her husband's personalty, if he died intestate, is disregarded, because in this state the wife by her marriage acquires no interest whatever in her husband's personalty. That remains after as before the marriage at the absolute disposal of the husband. The fact that a wife might possibly become entitled to an interest in the surplusage of her husband's personalty after his death, cannot be held to have obligated him to deal with her with relation to its value at the time of the making of the ante-nuptial agreement. In order to entitle her to any share in his personalty several contingencies must happen. She must marry her intended husband, he must die intestate, she must survive him, and he must leave more than enough personalty to pay all his debts. Both parties know as a matter of law that a woman's marriage to her intended husband

neither gives to her any interest in his personal estate, nor does it in any way affect his complete ownership and control of it. For this reason he has no cause to hide its value from her in order that she may be induced to take less in an ante-nuptial agreement, nor has she any occasion to ask or expect a disclosure of its extent, because however great it might be, her marriage would give her none of it. This being the situation of the parties at the time the ante-nuptial agreement was made, it would be unreasonable against the husband to base an imputation of fraud upon a presumed suppression of facts, which, if made known, could not have affected the interests of the intended wife.

Has the complainant then shown that there is such a variance between the values secured to her by the ante-nuptial agreement and those which she would, in this state, have acquired by the marriage; that Mr. Russell's representatives have the burden cast upon them to prove affirmatively that the complainant was fully informed of the extent and value of the interest she might acquire in his estate by her marriage?

The agreement itself secured to her $5,000 absolutely, and barred her from all claim, unless some further part of his estate were given to her by his will, &c., and by his will he recognized the ante-nuptial $5,000 and in addition gave her some bank stock, shown to be worth about $1,500. The purpose and intent fairly attributable to him was to secure to his intended wife the sum of $6,500. The complainant claims that this was so unconscionably small in comparison with the amount of all her husband's property that it must be presumed that he either falsely stated to her the extent and value of his estate or that he fraudulently concealed them.

But this is not, in this state, the true basis on which the comparison should be made to ascertain whether there is such gross disproportion as to suggest fraud. As above shown, it is not the whole of the husband's property, but only that part which by the marriage the wife would be entitled to receive, that should enter into the comparison. The complainant's counsel, however, has offered a large bulk of testimony touching the whole of Mr. Russell's estate, and mistakenly assumes that it is the dis-

Russell *v.* Russell.

crepancy between the value of the whole estate and the amount secured by the ante-nuptial contract which will indicate a fraud upon the wife.

The evidence touching Mr. Russell's real estate, which, for the reasons above stated, is the only portion of his property which can be considered on this point, is of the most general and indefinite character. Its location, its general territorial extent, its character, in the most general way, and estimates of its value are given. I have examined the complainant's testimony on this point, and upon the most liberal consideration I am unable to glean from it the means of arriving at any computation of the probable value of a dower right in Mr. Russell's lands. There is no showing that Mr. Russell's estate in any of the lands in question was one of inheritance. The proof as to each piece of real estate shows an estimate of the sale value of an estate in fee. In some cases it is shown whether the property is improved or not, and in a lesser number the gross annual rentals are given, but in no case is there any proof of the expenses incident to its maintenance.

A wife in New Jersey acquires on her marriage a vested, but inchoate right, which entitles her to have set off to her, in case she survives her husband, one-third in value of the lands whereof he was seized at any time during the coverture, of an estate of inheritance. But it cannot be said that the value of her dower right is ascertained by fixing the sale value of an estate in fee in the lands and taking one-third of that value.

The case in hand itself shows the impossibility of such a method. Mr. Russell's real estate has been described by the witnesses in ninety-two lots. This collocation is to a great extent the arbitrary selection of the witnesses, as several tracts are often put under one lot number. But to each lot an estimated fee-simple value is given. It cannot be said that Mr. Russell's intended wife, in entering into the ante-nuptial agreement, dealt with him upon an expectation that as his widow she might be endowed of one-third of the values here proven.

This would be to assume that the intended wife expected to get a full one-third interest in fee-simple. Taking the classification as proven, it seeks, as stated, not to show the properties,

so that a dower right in them could be valued, but simply to state an estimate of their total fee-simple values. There is an occasional proof of annual rental values of the tenant houses. Their trifling character may be seen when it is stated they run from $3 to $7 per month, and that the total annual rental of all the properties proven—twenty-two in number—is less than $1,300. There are also two small saw-mill properties, neither valued at $1,000.

There are two small farms, neither valued at over $3,500. His homestead, valued at $4,000, and the Lee property, at $3,739. Of these no rental value is given. The total value proven for all of the improved and rentable real property, which is the only kind of real estate that would give value to a dower right, does not, by the testimony offered by the complainant, exceed $35,000. The great bulk of the real estate consisted of more than fifty lots of unimproved bush, woodland and meadow lands, some of it subject to ebb and flow of the tide, necessarily wholly unproductive of any income (but requiring expenditures for taxes, &c.), none of which is of any substantial value for dower purposes, inasmuch as a widow cannot cut timber. All of this extensive unimproved and unproducing land was presented and used to swell the total value which the complainant had, as it is claimed, a right to enjoy in her intended husband's property, when she was misled into making the ante-nuptial agreement.

The evidence submitted does not afford sufficient certainty to enable any reasonably accurate estimate of the value of a dower right in Mr. Russell's lands to be made. It is the complainant's failure to exhibit such proof which prevents a determination whether the amount secured to the complainant by the ante-nuptial agreement is so much less than she would have secured by her marriage, as to induce a belief that she was misled, under the authorities cited.

If conjecture be adopted as the mode of arriving at so serious a result, the probabilities tend rather to show that there was no such discrepancy as would justify the belief. The certain and absolute ownership of the $6,500 under the ante-nuptial agreement is indicated to be of greater value to the complainant

than her dower right for life in one-third of the lands of Mr. Russell.

The weight of the evidence offered to prove the issue goes rather to show that there was no such disproportion between what the intended wife got by the ante-nuptial agreement, and what she would have received by the marriage, as would lead to the belief that she was induced to make that agreement by misrepresentation, or by suppression of the truth. The proofs indicate that she was as well cared for by the provisions of the agreement as she would have been without them.

This being the showing of the evidence, there is no burden cast upon the representatives of Mr. Russell to make affirmative proof of his fair dealing and frank disclosure of the condition of his property to his intended wife. If she lost nothing by the agreement, why should it be presumed that a fraud was perpetrated upon her in obtaining it to be made?

If there were any doubt that the complainant was fairly dealt with in the matter of the ante-nuptial agreement, it would be removed by her own subsequent conduct. The agreement was made on November 22d, 1892. Her marriage took place on the 30th day of November, 1892. Mr. Russell died on the 20th day of July, 1897. During the whole of Mr. Russell's life the complainant must have known that the ante-nuptial agreement was relied upon by him as a final settlement between them. She acknowledged that he never intimated any dissatisfaction with it during his life.

She had given her copy of it to Mr. Mulford, the trustee, and could have obtained it for re-examination or consultation at any time during the five years of her married life. If it was a fraud upon her, she could have proceeded in equity for its correction, even during Mr. Russell's life. But that it was not, is strongly indicated by her own conduct after Mr. Russell's death, which happened, as stated, on the 20th day of July, 1897. His will was proven on the 31st day of July, 1897. She was now free from any possibility of being misled by Mr. Russell, she knew (if she believed the charges in her bill of complaint) that Mr. Russell had not made a liberal provision for her in his will, and she also knew that he had not dealt candidly with her in stating

to her the value of his property. Her natural course of conduct would have been to file a bill at once to redress her wrongs.

Far from asserting that the ante-nuptial agreement was a fraud upon her, the complainant, on December 22d, 1897, more than four months after the will was proved, accepted from Mr. Mulford, the trustee under the ante-nuptial agreement, a part payment of $500 on account of the $5,000 secured to her by that agreement, and was in treaty to receive and invest the remaining $4,500 when she changed her mind, and concluded to begin the present suit. Her only explanation of this course of conduct is that she accepted the part payment without advice. The opinion and advice of counsel learned in the law is often needful and safe to be taken, but it ought not to be allowed to be used as a shield to protect from responsibility a course of conduct in a matter so simple as to require no legal advice.

The action of the complainant in accepting the situation under the ante-nuptial agreement during the marriage and for months after Mr. Russell's death and proof of his will, goes far to corroborate the other proofs in the case, which indicate that she was in no way misled in making that agreement.

I will advise that the complainant's bill be dismissed, with costs.