WILLIAM G. KELSO, complainant,

*v.*

ANNA L. KELSO, defendant.

[Decided July 8th, 1924.]

1. The lack of independent advice will not nullify a deed made by a man to the woman whom he wished to marry if he, at the time he executed the deed, appreciated his position and the consequences of the act which he was doing, unless it is shown that illness, extreme old age, dependence on the grantee, undue influence, or some such cause exists.

2. Evidence examined and *held* that the bill to reform or cancel such deed should be dismissed.

On bill, &c.

*Mr. Harry Lane,* for the complainant.

*Messrs. Seuffert & Elmore,* for the defendant.

BENTLEY, V. C. (orally).

This case having been tried at such great length, I am going to at least indicate what I consider to be the proofs, and I may or may not finally dispose of the questions as I talk myself into a state of mind.

The bill is filed by a husband against a wife, originally, to impress a constructive trust upon certain property transferred by the complainant to the defendant, and to have her turn the property back to him, with a prayer for restraint and a receiver.

Subsequently, it was amended so as to charge fraud and undue influence; and still later, upon the final hearing, to set up the further ground of lack of independent advice.

The complainant, now sixty-seven years of age, was a widower at the time of meeting the defendant in the summer of 1921, his first wife having died in the spring of 1920. He has been employed a great many years, practically all his life, as a shoe salesman, and by his industry and frugality and that of his family had acquired a competence of, roughly, $35,000, made up, as I recall it now, of a house in which he lived in Hackensack, and three mortgages, totaling $25,000.

At the time of meeting the defendant his family consisted of four sons, all of whom were self-supporting and living away from him, and one daughter who was about twenty or twenty-one years of age, who had remained with him and was taking care of his home.

This man was violently attracted by the defendant, and undoubtedly set out to woo her, and eventually won her hand. I say this because there has been some attempt to make it appear that this defendant was a fortune-hunter, which I do not believe. I think that the pressure of the courtship was exerted only upon his side, and that she was

very largely impressed by the ardor of his suit, his show of affluence and generosity, and the entirely practical consideration of a help-meet in the support of herself and her three sons. In the early winter after meeting her he appears to have proposed to her, and then learned from her own lips that she was still married, whereupon, I think it is clear, he suggested that she go to Nevada and there secure a divorce which he agreed to finance, and which he did finance, including presents to a very large sum of money, totaling almost $6,000. He went to the city of Reno with her and the youngest of three minor sons. There he saw to the preliminary arrangements, remained with her a few days, and returned east to his residence in Hackensack. That was followed by three other trips to Nevada, the second one being of no moment. On the third one I have in mind he started about the 26th of November, 1922, and while *en route* had delivered to him a telegram from the defendant in which she recommended that he should not come immediately, but explain a telegram that she had received purporting to come from his sons. Concerning the contents of this telegram of hers, there is great diversity between them. However, he had started, and, in his then frame of mind, he didn't turn back, but continued on out there, to learn that one or more of his sons had sent a western union night letter to the defendant couched in hostile terms and threats, with the design of breaking up the proposed marriage of these parties. As the result of the consternation caused by this telegram, it was then determined that he should return east and convey to her all of his property, for the purpose of discouraging any attempt upon the part of his children to commence a litigation. He says that it was upon the understanding, enforceable, I suppose, if true, as to the personalty, that she would reconvey to him in the future when his difficulties with his sons should have blown over and upon request. She denies this, and I believe truthfully, for the reason that I consider this another move in his consuming passion to make certain of her hand, and for other reasons upon which I shall presently touch.

After a very brief stay in Reno he re-embarked and came back to his home, where he consulted Mr. Howard Mackay, a solicitor of this court living in the complainant's town of Hackensack, and as a result of that interview he executed the necessary conveyances to transfer all the property that I have mentioned over to the defendant, to whom he was not then married.

He then, about Christmas time, still in 1922, returned again to the defendant, who, in the meantime, had had her two elder boys go out and stay with her, both of whom were ill. Her decree of divorce being granted on the 2d of January of this present year, the parties were married the following evening in San Francisco, California. They then appear to have commenced their long journey home and, according to the defendant, the trouble that has since eventuated started on the train.

Of course, I am not concerned with much of the great mass of testimony that has been introduced about the present and recent relations of the parties. Under the bill as it was originally framed is presented the issue of whether or not this was a voluntary conveyance, or was . a conveyance to her in trust, the trust being her willingness to reconvey upon his request; and, subsequently, as the amendment showed, whether or not there was any fraud or undue influence, and whether or not he lacked having had the benefit of independent advice.

So far as fraud is concerned—I mean fraud at the inception of the contract—or undue influence, I see no evidence in this case, either direct or circumstantial, out of which. I can find in favor of the complainant. It is true that the man appears to have been madly infatuated with the defendant, and it is also true that he did a very foolish thing, but I don't see how out of that I can spell undue influence. And there is no pretense of fraud. let alone the clear proof that is required to establish it. Reluctantly—and I say "reluctantly" because I realize the effect upon the complainant of finding against him—it seems to me that I must find as a fact that there was no such promise made by the defendant

as he says there was in the fall of 1922, and that is very largely for reasons that counsel for the defendant has elaborated upon more than I shall do, such as his unquestioned assertion to her when he proposed marriage that she would have everything that he had in the world. I think that that is not denied. And, secondly, the very luminous fact that in May, 1922, after he had deposited the defendant at Reno, and without any talk with her about it—without any pressure from her—he made the will, as he said on the stand, but that he thought it had been destroyed. And he wrote her to that effect. She says, and I think it fits in with all the testimony and with all the facts in the case, that his letters to her to that effect was the first intimation that she had that he was going to make a will.

Now, here was a man who was a free agent, *sui juris,* who, without any request, made what he thought was a secure provision for this woman if anything happened to him. It is very significant that this man, whose memory is remarkable, and who kept notes and memoranda of all these things, testified upon the stand that the will was not made in May, but in the month of November of 1922, or six months later.

Now, I can see only one explanation of his post-dating— on the witness-stand I mean—the making of the will for a period of six months, when he had made it only a year and a half before. That was an important thing in the man's life—the making of a will and disposing of all his property— especially where the will is entirely unnatural, cutting off everybody who was dear to him, and especially cutting off this daughter who was unmarried and at that time living with him in all apparent happiness.

Furthermore, it seems to me that the defendant's statement of what took place, corroborated to a large extent by the complainant himself, when his sons undertook to stir up trouble, is perfectly natural. This man admitted on cross-examination that he was putting his best foot forward to win the woman of his choice; he admitted that he wanted to win the love of this woman when he found that there was a likelihood of his sons interfering with his cherished design. I

think it was a most natural thing that he should have talked it over with her in Reno, and I confidently believe that they did talk it over on that late November visit, and it was agreed between them that he should strike while the iron was hot and go back and convey these properties to her. As I say, the individual facts, the letter written—drafted upon the train to his daughter—everything, indicated to me that this man did at that time intend to make an irrevocable gift of everything that he had. I am not inclined to agree, for a number of reasons, with the defendant's theory that this was the execution of an executory contract in contemplation of marriage. I don't think that their minds ever met on that, and I don't believe it can be said that that was one of the considerations upon which this woman agreed to marry him.

That leaves the question that complainant's counsel has just raised, and to which there has been no reply, that the statute of frauds applies only to real estate, and that an express trust in personal property may be established by parol. But in view of my findings of fact, I suppose that there is no application of that law at all. That leaves only the question of applying the doctrine of independent advice.

That doctrine, which has, I think, probably been developed in this state beyond the development in any other jurisdiction whatsoever, is, of course, designed to secure a man against improvidence in acts similar to this. The chief-justice, in his opinion in *Slack* v. *Rees, 66 N. J. Eq. 447,* lays the doctrine down in the broadest possible terms. He says there, and points out the error into which this court fell in its opinion in the case, that it goes away beyond any question of fraud and undue influence; that its scope is to protect the donor from the effect of a voluntary gift of any considerable portion of his estate, as explained in the case of *Hall* v. *Otterson, 52 N. J. Eq. 528,* and is to protect him against the effect of a conveyance to somebody standing in a confidential relation—a confidential relation of any sort— without the realization of the effect of his bounty upon himself.

Now, I say to Mr. Lane, that if he can persuade me that this doctrine should be invoked, it ought to be applied to this case. I mean by that, as I have indicated, that the natural equity, so to speak, of the case, is in favor of the complainant, if there is any way of working it out. Here is a man, no matter what he had done, who stands before this court in the extremely hard condition of having had wiped away from him with a stroke of the pen all the savings of a lifetime, and just at a moment when he is most likely to be dependent upon it for his very existence. His earning days must be nearly over, and he stands stripped of almost everything that he has except some slight interest that he may have in the $15,000 mortgage on the Wegman Parkway house, although I don't suppose he has any left in that.

She, on the other hand, even if she did not have this property, would, of course, have her inchoate right of dower in the real estate, and could appeal to this court and compel her husband to support her, so long as she tried to perform her part of her obligation, forever. It is a sad case. The law of this state attempts to throw around a man protection against such actions as this. This man seems to have been consumed with the desire to destroy himself. He has broken through every barrier which the law his thrown around him for his own protection, and unless Mr. Lane can convince me that, on some such theory as he has thrown out, about this man not understanding the consequences of his act, I feel that I shall have to dismiss the bill, because here is a man who knows enough of the world, who has brought up a large family, supported them, educated at least one of his children in college, who himself has picked up considerable education even though he had to leave school at a very tender age and go to work. He has been able to amass a competence in addition to all those things against his old age. Apparently, he has been a successful business man in his line of work. He says here on the stand that he did know what it meant to sign these instruments, and then he went on and illustrated that he knew what it meant when he said that if she kept the property it left him "without a shirt."

Now, as I have indicated, I am ready to give you an opportunity, Mr. Lane, to submit a brief, or further argument, or anything you want, because I feel that this is a very hard case. I don't want it to be one of those hard cases that make bad laws however.

### MEMORANDUM OF OPINION.

BENTLEY, V. C.

At the request of counsel I have heard additional argument on the single question of lack of independent advice. Of course, there can be no question that the complainant did execute the various conveyances involved without independent advice. The solicitor by whom the instruments were prepared, and before whom they were executed, very frankly admitted that he had not cautioned the former as to the effect and consequence of his act upon himself. However, I still feel, as I did at the conclusion of the final hearing, that there was no occasion for anybody to warn him of what he was doing, for the reason that he well appreciated his position, what he was doing, and the possible results that might flow therefrom. The leading case in this state, and, as I have indicated, authorities from other jurisdictions are of little or no value, is that of *Slack* v. *Rees, 66 N. J. Eq. 447.* In that case (at *p. 449*) the kernel of the doctrine under consideration is expressed in these words:

"Its purpose is not so much to afford protection to the donor against the consequences of undue influence exercised over him by the donee as it is to afford him protection against the consequences of voluntary action on his part, induced by the existence of the relationship between them, the effect of which, upon his own interests, he may only partially understand or appreciate."

Of course, it is unnecessary to cite authorities to show that one may, under proper circumstances, without discussing the matter with anybody, voluntarily alienate all of his property to any person, entirely without consideration. He may do it by will, or he may do it by deed. If, as was said in *Hall* v. *Otterson, 52 N. J. Eq. 528,* and quoted in

*Slack* v. *Rees,* no deception or undue influence appears, and all was fair, open voluntary and *understood,* the transaction is unimpeachable. So, as I understand the doctrine, it is only in those cases where, because of illness, extreme old age, dependence upon the grantee, undue influence or some such cause exists, that the doctrine is applicable. Surely, it cannot be said that there is any such mental ascendancy of a bride-elect over her fiancé as would make it necessary for him to seek independent advice before bestowing upon her his bounty. Violent as the exaltation of an honest courtship may be, it surely cannot be said to amount to an aberration of mind. If this were so, no marriage settlement would be safe, and, of course, it is elementary that these compacts are regarded by the law with great favor.

At the close of the case the complainant was recalled to the stand, and upon further cross-examination the following answers were made to the following questions:

"*Q.* You knew at the time you made the transfer that you were transferring all of your property to her?

"*A.* At that time? To her; yes, sir.

"*Q.* And had you ever taken up the situation as to what would happen if she didn't give it back to you?

"*A.* I did; I knew I would be left without a shirt.

"*Q.* And knowing that, you made the transfer?

"*A.* Yes.

"*Q.* And you took the risk?

"*A.* I did. I had faith enough in her to believe that she was perfectly honest; yes, sir. Otherwise I would have had different papers drawn up."

The highly expressive language in answer to the second question, coming from a man of the experience and mental and physical vigor of the complainant, defeats all possibility of my belief that he stood in need of any counsel or advice as to what he was doing when he stripped himself of his property to present it to the defendant. His counsel has argued with great ingenuity that while he may have realized the difficulty to which he would be put, he did not appreciate the fact that he would have no cause of action against his wife to recover back what he was giving her. This, of course, is not sound, because he does not say any such thing,

but said that he realized that if she refused to share or return his property he would be penniless, or, in the vernacular, that "I knew I would be left without a shirt."

I regret that the earnest and extremely able effort of complainant's counsel to change my mind has been without avail. There must be some stability to the title of property, and I feel that if I should permit the complainant to nullify his well-understood grant it would be pushing the application of the doctrine of independent advice to a perilous length.

I will advise a decree dismissing the bill.