On March 31st, 1921, August G. Apel, the father of the complainant, Pauline Marie Selinger, conveyed to the defendant, Samuel Selinger, the premises known as No. 802 Main street, in the township of North Bergen, in the county of Hudson, State of New Jersey; the deed of conveyance was recorded on April 1st, 1921, in book 1394 of deeds for Hudson county at page 411. The complainant contends that the premises were conveyed to the defendant in trust for her use and benefit and she seeks a decree to that effect.
In the year 1918 the complainant was a nurse in the North Hudson Hospital, Union City, New Jersey; the defendant, then, was a medical interne in the same institution. The complainant at that time was the wife of one Hagen from whom she was separated. The defendant knew this. Despite the complainant's then existing marriage they became engaged to marry. Sometime in the year 1920 complainant instituted divorce proceedings against Hagen, her husband, and obtained a final decree of divorce February 17th, 1922. On the same day, the complainant and defendant married. Prior to their marriage the defendant opened an office in West New York and engaged in the practice of medicine; the complainant, on May 19th, 1920, entered his employ as a nurse, and lived in his house.
During the course of their engagement, they discussed conversations they, or one of them, had with complainant's father about a transfer of the premises in question. He questioned her father's good faith towards him and they quarreled. She left defendant's home and returned to her parents. The cause of the quarrel was brought to her father's notice. The father and the defendant went over the matter; and subsequently the conveyance was made.
The defendant had many conversations with the complainant's parents about his proposed marriage to their daughter; these conversations, he testified, began in the latter part of 1918 or the early part of 1919, in the home of the Apels. "They reassured me," he said, "they would give me as a wedding gift the house at 802 Main street," and "at the *Page 263 
time of the making of the deed in March, 1921, and just before that, they wanted to be reassured that I would marry the daughter because the process of divorce with her first husband had already been started before that, and I said yes. And to show me their good faith both Mr. and Mrs. Apel transferred the property to me as a wedding gift."
Apel, the father of the complainant, said that the defendant, a week or ten days before the execution of the deed, spoke to him about the property, and that he said to the defendant: "Listen, doctor, I will turn that house over to you in care of Pauline, because she wasn't married yet. I didn't give it but I wanted to show him that I do the best I can. I liked him and I always did like him," and "I told him, I says, `all right.' I first wanted to turn it over to Pauline and he [the defendant] says, `why don't you turn it over to me?' I says, `all right, I will turn it over to you if you will marry Pauline, yes.' Then I says, `I will turn it over to you in care for Pauline.'" The witness testified the proposition was satisfactory to the defendant. The mother of the complainant was asked this question: "And who were you signing the house to, your daughter or Dr. Selinger? A. Both of them" Also, Q. "Did you tell Mr. McDermott [the realtor, who prepared the deed] that you were giving the property to both of them? A. Yes."
Prior to the day the deed was executed, the father of the complainant called at the office of Edward McDermott at Union City, and directed McDermott, whose business was that of architect, realtor and insurance agent, to prepare a deed transferring the property to the defendant. McDermott testified that the complainant's father, Apel, said "he was transferring the property to Dr. Selinger for his use" and "the doctor was engaged to his daughter and in consideration of that fact, and for the purpose of giving the doctor a financial status, he was transferring the property to him."
When the deed was executed in McDermott's office there were present, besides McDermott, both parents of the complainant, the defendant, and the defendant's attorney, Albert Margolies. The doctor testified, "I had to have some lawyer *Page 264 
represent me" * * * "I was a stranger to Mr. Frosio [associated in business with McDermott] and Mr. McDermott. I never knew them before. I knew Mr. Margolies at the time. I had to have somebody represent me." Mr. and Mrs. Apel were not represented by counsel. It does not appear that they had the benefit of legal, or independent, advice. They are both old, evidently uneducated, speak with a strong foreign accent, are apparently trusting, guileless and innocent. Kelso v. Kelso, 95 N.J. Eq. 544. I do not believe their testimony is in the least colored. Their demeanor bore the earmarks of credibility and truth. The complainant's father still holds the defendant in esteem. The defendant appears to be intelligent, wide-awake, practical, calculating and shrewd; a so-called "financial success." He impressed me as lacking sincerity and credibility. It was held inRiehl v. Riehl, 101 N.J. Eq. 15, that: "The Chancellor, as the trier of the facts of a case before him, is the judge of the credibility of the witnesses, and, like a jury, does not have to believe a particular witness; a witness is not entitled to credit whose testimony is inconsistent with the common principles by which the conduct of mankind is naturally governed, and the court may disbelieve a witness whenever there is reason therefor."
I believed the defendant during the early period of his engagement to complainant designed and planned to get hold of the disputed title. His assertion that there was a conveyance to him based upon a consideration of marriage, would, under ordinary circumstances, be a good consideration; but in the instant case it was not. The conveyance was made to the defendant when it was impossible for him to marry the complainant because of her then existing marriage to Hagen. She was not divorced from Hagen until almost eleven months after the execution and recording of the deed. Under the circumstances, such an agreement as defendant contends existed between him and complainant's father was clearly void and in contravention of public policy. It is the kind of agreement the law abhors and the vice of it was condemned in no uncertain language by Chief-Justice Beasley *Page 265 
in Noice v. Brown, 38 N.J. Law 228, when he said: "The defendant, being a married man, and living apart from his wife, and in expectation of a divorce from her by force of a bill then pending, promised the plaintiff to marry her * * * after divorce * * * obtained. I cannot see the faintest semblance of legality in the promise * * *. A contract is totally void, if, when it is made, it is opposed to morality or public policy. The institution of marriage is the first act of civilization, and the protection of the married state against all molestation or disturbance is a part of the policy of every people possessed of morale and laws. But this relationship, in order to execute the purpose for which it is established, requires the undivided devotion of each of the parties to it to the other, and the consequence is that it is invaded and impaired by anything which has a tendency to alienate such devotion." While I do not consider the illegality of the consideration for the conveyance as having any bearing upon, or the determining factor of, the issue between the complainant and the defendant — and it cannot be so regarded — yet, it may not be amiss to give a moment's attention to the legal effect of the transaction between the defendant and the complainant's father. If the alleged agreement had not been executed, but were merely executory, it could not be enforced because of its illegality. When the illegality of a contract is made to appear, the law will not extend its aid to either of the parties. It does not sit as an arbiter of differences arising out of an illegal contract. The maxim that equity follows the law holds good in proceedings involving questions of public policy; and where the parties arein pari delicto equity will leave them in the position in which they have placed themselves. Ownes v. Ownes, 23 N.J. Eq. 60;Ellicott v. Chamberlin, 38 N.J. Eq. 604.
The general rule is that wherever any contract or conveyance is void, either by a positive law or upon principles of public policy, it is deemed incapable of confirmation upon the maxim "what was not good in the beginning cannot be rendered good by time." But where it is merely voidable, or turns upon circumstances of undue advantage, surprise, or *Page 266 
imposition, there if it is deliberately and upon full examination confirmed by the parties, such confirmation will avail to give it an ex post facto validity. Although it is beside the issue, it does not appear from the time of the marriage of the complainant and defendant that there was any confirmation of the transfer of the title by the grantors.
I am not convinced that at the time of the execution of the deed to the premises from the complainant's father to the defendant that it was made in consideration of the defendant's contemplated marriage, but I believe the intention of the grantors was that their daughter, the complainant, should have the use and benefit of the title, and at the urge and insistence of the defendant that the title should be placed in his name they complied with his request. The testimony of the complainant's father, above recited, indicates what his intention was. Riehl
v. Riehl, supra. The grantors expected defendant to marry their daughter; they appeared to trust him and to have confidence in his integrity. They conveyed the property to him by a deed absolute on its face, habendum to his use for a nominal consideration; I feel they did it with the belief, and under the direction that he (the defendant) would hold the title for the benefit of their daughter. I do not think the grantors are, or were, able to make fine distinctions in expression and are capable of appreciating what exact language was necessary to insert in the deed in order to state their intention; as before observed, they had no independent advice, they were without counsel; but the defendant was well fortified — he had counsel; he evidently overlooked nothing to secure himself — and to enrich himself. They, the grantors, relied on the good faith and conscience of the defendant — and I am satisfied they made a mistake. The principle enunciated in Szpak v. Szpak, 114 N.J. Eq. 143; Burger v. Burger, 105 N.J. Eq. 403; Hall v.Otterson, 52 N.J. Eq. 522, applies:
"In all transactions between persons occupying relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, is presumed, or in fact reasonably exists, the burden of proof is thrown upon *Page 267 
the person in whom the confidence is reposed and who has acquired an advantage, to show affirmatively, not only that no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood."
The defendant won the confidence of the Apels; his explanation of the conveyance does not, in my opinion, ring true, and, accordingly, he has failed to sustain the burden the law imposed upon him. Mott v. Mott, 49 N.J. Eq. 192.
Relations between persons engaged to be married are confidential. Russell v. Russell, 60 N.J. Eq. 282; affirmed,63 N.J. Eq. 282. The defendant on the stand boldly and unhesitatingly declared, in effect, the marriage, without the conveyance, "just could not be." His attitude suggested the inference that, to him, the marriage was only an article of commerce — a thing to be bartered, sold or exchanged.
The complainant collected the rents from the property, paid the taxes and interest on the mortgage covering the premises and exercised a general supervision over it for a number of years. The defendant subsequently assigned some other person to collect the rents. The mortgage on the premises is now in default and is being foreclosed. It is argued that this situation was created by the defendant to divest the complainant of any interest she may have in the property and to enable him to buy it at the sheriff's sale and then place it in a holding company controlled by him. I believe there is considerable force in the argument.
The complainant is not chargeable with laches. Schuler v.Schuler, 114 N.J. Eq. 230; Szpak v. Szpak, supra.
In my opinion, the defendant's conduct throughout the entire transaction was characterized by bad faith, imposition and lack of sincerity, and calls for equitable relief. Coffey v.Sullivan, 63 N.J. Eq. 296. I shall, accordingly, advise a decree declaring that the defendant holds the premises in trust for the use and benefit of the complainant and that he be required to give an accounting. *Page 268