195 N.J. Super. 16 (1984)
477 A.2d 833
REBA R. MARSCHALL, PLAINTIFF,
v.
JOHN F. MARSCHALL, DEFENDANT.
Superior Court of New Jersey, Chancery Division Bergen County, Family Part.
Decided March 23, 1984.
*20 Arthur Rose, for plaintiff (Rose & DeFuccio, attorneys).
John B. Landers, for defendant.
LESEMANN, J.S.C.
Two cross-motions in this matrimonial case raise important issues not yet resolved in this State: the conditions under which an antenuptial (premarital) agreement defining the rights and obligations of husband and wife in the event of a divorce should be enforced, and the related issue of burden of proof, viz: whether the proponent or the opponent of the agreement must establish either the conditions of validity or the conditions of invalidity of the agreement.
The issues arise from plaintiff wife's motion seeking pendente lite support. Defendant husband opposes that claim and also seeks summary judgment dismissing those portions of the complaint which demand equitable distribution, support and counsel fees. In the alternative, defendant asks for specific performance enforcing the antenuptial agreement which he claims bars all such relief.
Plaintiff and defendant were married on March 3, 1979, when he was 65 years old and she was 60. Each had been married before and each had grown children from that prior marriage.
Until her marriage to defendant, plaintiff had lived in a home she owned in Fort Lauderdale, Florida. At defendant's suggestion, she sold it for approximately $200,000.00. The proceeds of that sale represent her major asset and produce most of her annual interest and dividend income of approximately $20,000. In addition she receives Social Security benefits of $200 per month.
In 1979, defendant was, and he still is, a man of considerable substance. He acknowledges that throughout his marriage to plaintiff he had an annual gross income in excess of $250,000 and he also acknowledges a net worth of more than $5,000,000.
*21 Following their marriage the parties lived part of the year in a cooperative apartment which defendant owned in Florida, and part of the year in another apartment he owned in Hackensack. They separated during the summer of 1983 and the complaint for divorce and the present motions were filed shortly thereafter.
The parties' antenuptial agreement was signed and acknowledged (in New Jersey) on January 24, 1979  approximately six weeks before their marriage. It is relatively brief and simple, consisting of an introduction followed by eight numbered paragraphs. Exclusive of signatures and acknowledgments, it encompasses just a little more than two double-spaced, type-written pages.
The introductory paragraph states that the parties (identified as "Reba" and "John") are contemplating marriage and "are desirous of defining their respective property rights for the benefit of themselves and their children." It then says that "for value received", the parties agree that "all real and personal property" owned by either of them at the time of their marriage, or which either "may acquire from any source whatsoever during their marriage" shall remain "their respective separate property" except as "expressly otherwise provided" in the agreement. In the event of a "termination of the marriage during his lifetime" John is to pay Reba $100,000 "in full satisfaction of all claims" against him. Should John predecease Reba "during the marriage", she is to receive $100,000 free of estate or inheritance taxes and also free lifetime use of his Florida apartment. Should Reba predecease John, her estate is to "pass free from any claim by John." Each party agreed to remain responsible for his and her own premarital debts, and each reserved the right to provide more generously for the other by will.
In arguing for the validity of the agreement defendant claims that "prior to the execution of this agreement, Reba was represented by independent counsel who negotiated the agreement *22 on her behalf." Plaintiff does not deny that representation, but claims that defendant concealed his financial condition, and that she entered the agreement "for purposes ... of insuring my independent state would remain so," without the "remotest idea of defendant's net worth, his income, or the vast extent of his holdings and the immense value of his assets." She notes that she had been living in Florida and had no knowledge of defendant's business interests and financial affairs in New Jersey. She says she had no "inkling" that he was "very cleverly duping me" into an unfair agreement "adverse to what any wife has the right to expect." She charges that he "made no effort to disclose his wealth to me and concealed this by omitting any questions of disclosure of my assets, income or net worth." Plaintiff points out that the agreement does not refer to any disclosure and says she was "astonished" to hear defendant's comments concerning his net worth  which he initially placed at $12,000,000, but which he has now reduced to $5,000,000. She claims she "gave up my home and my furniture and altered my entire life" in anticipation of her marriage and "had no way of knowing that this spirit of accommodation and compromise was being met by duplicity and concealment of assets by my husband."
In view of the large volume of matrimonial litigation today and the number of second and even third marriages that come before the courts, it is surprising that there has been no clear-cut decision in this State, concerning the validity, and conditions of validity, of antenuptial agreements which define rights and obligations in the event of a divorce. Nevertheless, that is precisely the case. Indeed, commentators have noted that there remains uncertainty as to whether the law of New Jersey has moved away from the traditional common law view that such agreements are contrary to public policy and void because they tend to facilitate or promote divorce. See, 1 Skoloff, New Jersey Family Law Practice, § 7.4B (4th ed., 1982); Note, 12 Rutgers L.J. 283 (1980).
*23 That "traditional" view distinguished between antenuptial agreements which defined rights in the event of death (favored by the law and generally enforced) from agreements dealing with divorce, which were viewed as inconsistent with the state's interest in preserving marriage and hence void. As late as 1970  and sometimes even thereafter  that rule was set out as the settled law in most jurisdictions in the United States. Thus, in the leading case of Posner v. Posner, 233 So.2d 381, 382 (Fla.Sup.Ct. 1970), the court noted that:
It has long been the rule in a majority of the courts of this country ... that contracts intended to facilitate or promote the procurement of a divorce will be declared illegal as contrary to public policy.... The reason for the rule lies in the nature of the marriage contract and the interest of the State therein.
And in the Note cited above the author comments that:
Before 1970 (the date of the Posner decision) antenuptial agreements that stipulated terms regarding alimony and property settlement upon divorce were almost universally considered void as against public policy. [12 Rutgers L.J., supra, at 292.]
To the same effect, see 2 Lindey, Separation Agreements and Antenuptial Contracts, § 90 at 90-33 (1983). But see supplementary pages in the same volume citing later cases that uphold such agreements.
As noted, Posner v. Posner, supra, is the leading case upholding the validity of antenuptial agreements dealing with post-divorce rights and obligations. It has been frequently cited and more often than not followed in other jurisdictions.
In Posner the court first noted the favored treatment of antenuptial agreements which fixed rights and responsibilities in the event of the death of a spouse:
Antenuptial or so-called `marriage settlement' contracts by which the parties agree upon and fix the property rights which either spouse will have in the estate of the other upon his or her death have ... long been recognized as being conducive to marital tranquility and thus in harmony with public policy. [233 So.2d at 383.]
The different treatment accorded agreements dealing with divorce, the court said, stemmed from what had been viewed as the interest of the state in preserving marriages, from the generally accepted view that a divorce could not be obtained *24 simply because the parties wanted one, and from a fear that permitting the parties to agree upon the consequences of divorce might induce or encourage one of them to precipitate a divorce which might not otherwise have occurred. However, the court continued, present social conditions are vastly different from those that existed when the invalidity rule came into existence:
We cannot blind ourselves to the fact that the concept of the `sanctity' of a marriage  as being practically indissoluble, once entered into  held by our ancestors only a few generations ago, has been greatly eroded in the last several decades. [Id. at 384.]
The "ratio of marriage to divorce has reached a disturbing rate", it said, and many states were now (in 1970) contemplating something new  "no fault" divorces:
With divorce such a commonplace fact of life, it is fair to assume that many prospective marriage partners whose property and familial situation is such as to generate a valid antenuptial agreement settling their property rights upon the death of either, might want to consider and discuss also  and agree upon, if possible  the disposition of their property and the alimony rights of the wife in the event their marriage, despite their best efforts should fail. [Ibid.]
Accordingly, the court concluded that such antenuptial agreements "should no longer be held void ab initio as `contrary to public policy'." Id. at 385. Rather they should be enforced (although subject to modification for changed circumstances) so long as they comply with those standards which the court had previously set out in Del Vecchio v. Del Vecchio, 143 So.2d 17 (Fla.Sup.Ct. 1962), as applicable to antenuptial agreement covering post-death rights and obligations. In Del Vecchio, those conditions were said to be, essentially, either a showing that the agreement was "fair" to the party sought to be bound or, in the alternative, that there either had been full disclosure of all relevant financial information to that party, or that the party had obtained such information from some other source.
Since Posner the weight of authority has favored the validity and enforceability of antenuptial agreements dealing with divorce, generally subject to variously stated conditions of disclosure and/or fairness. See e.g., Newman v. Newman, 653 P.2d 728 (Col.Sup.Ct. 1982); Scherer v. Scherer, 249 Ga. 635, 292 *25 S.E.2d 662 (Ga.Sup.Ct. 1982); Osborne v. Osborne, 384 Mass. 591, 428 N.E.2d 810 (Mass.Sup.Jud.Ct. 1981); In re Burgess, 646 P.2d 623 (Okl.App.Div. 1982). Some courts, however, have persisted in the "old" view, and have refused enforcement. In re Gudenkauf, 204 N.W.2d 586 (Iowa Sup.Ct. 1973); Connolly v. Connolly, 270 N.W.2d 44, (S.D.Sup.Ct. 1978). Others have distinguished between premarital attempts to fix property rights, as opposed to support rights, upholding the former but rejecting the latter. Eule v. Eule, 24 Ill. App.3d 83, 320 N.E.2d 506 (Ill. App.Div. 1974). See also Restatement 2d, Contracts, 189 at 54-55 (1979). For a review of the applicable rule in many of the states, and a comprehensive discussion of the entire subject of antenuptial agreements, see 6 Family Advocate (No. 3, Winter, 1984), and particularly, Jones, "What the States Say About Prenuptial Agreements," id. at 26.
Although a number of New Jersey cases have involved antenuptial agreements dealing with post-divorce rights and obligations, none squarely addresses the validity (or conditions of validity) of such agreements. New Jersey is not mentioned in the Family Advocate survey cited above.[1]
Chaudry v. Chaudry, 159 N.J. Super. 566 (App.Div. 1978), referred to by the parties here, involves such an antenuptial agreement, but turns on a choice of law issue and not on the status of such agreements under New Jersey law. There the parties were citizens of Pakistan and had been married in that country. While the husband was residing in New Jersey and the wife in Pakistan, he obtained a Pakistani divorce through that country's consulate in New York. The validity of the *26 divorce was upheld by a trial court and an appellate court in Pakistan and our Appellate Division refused to hold to the contrary. It found that:
... principles of comity require that the divorce be recognized here. [Id. at 575.]
After reaching that conclusion, the court also rejected plaintiff's claim for equitable distribution. It found the claim barred by an antenuptial agreement which had been negotiated in Pakistan between defendant and plaintiff's parents. The court found "no reason of public policy" that would justify its refusing to interpret and enforce the agreement:
... in accordance with the law of Pakistan, where it was freely negotiated and the marriage took place. [Id. at 578.]
Thus the court did not interpret or apply New Jersey law. It held only that enforcement of the law of Pakistan in the case before it did not violate New Jersey's public policy.
Russell v. Russell, 60 N.J. Eq. 282 (Chan. 1900), is also sometimes cited as a holding concerning the validity and conditions of validity of an antenuptial agreement. See 10 N.J. Practice, Silverman, Marriage, Divorce and Separation (4th ed. 1978), § 205 at 163-167. The agreement in Russell, however, involved the rights of the wife following the death of the husband. While it upheld the agreement and set out obligations of fairness and disclosure, it is simply a manifestation of the traditional rule enforcing and encouraging such agreements with respect to rights and obligations on the death of a spouse. It does not deal with divorce.
Other New Jersey cases referred to by the parties here or cited by one or more text writers, do not require extended discussion. Most concern rights and obligations on the death of a spouse, and none purports to pass on the validity, or conditions of validity, of an antenuptial agreement fixing post divorce rights and obligations. See, e.g., Fern v. Fern, 140 N.J. Super. 121 (App.Div. 1976) (agreement found to terminate on death); First National Bank v. Miley, 3 N.J. Super. 348 (Ch.Div. 1949) (rights following death of spouse); Moore v. *27 Smith, 5 N.J. Eq. 649 (E. & A. 1847), aff'd. 4 N.J. Eq. 485 (Ch. 1845) (guaranteeing wife control of her separate property); Kelso v. Kelso 95 N.J. Eq. 544 (Ch. 1924), aff'd. 96 N.J. Eq. 354 (E. & A. 1924) (reference to favored status of antenuptial agreements generally).
The issue, then, must be addressed as one of first impression in this State. On that basis, this court has no hesitation in holding that (subject to the conditions described below) antenuptial agreements fixing post-divorce rights and obligations should be held valid and enforceable.
The reasoning of Posner is sound and persuasive. Indeed, its comments on the social phenomenon of increased divorce rates and erosion of "the sancity of a marriage" are, if anything, understated. Today, fourteen years after Posner, those observations have become commonplace. The skyrocketing divorce rate has not abated.[2] And the social and economic problems which flow from those divorces have not become simpler to resolve. Indeed, if anything, they are more complex now than they were then.
As high divorce rates have continued, there has naturally evolved a concurrent increase in second and third marriages  often (as in this case) of mature people with substantial means and separate families from earlier marriages. The conflicts that inhere in such relationships make the litigation that follows the breakup of such a marriage even more uncertain, unpleasant and costly than would otherwise be the case. At the same time, the advent of equitable distribution has injected an inevitable element of uncertainty into the divorce process and  probably also inevitably  has complicated the litigation process and *28 increased its already substantial cost. Applications for counsel fees in five figures are not at all uncommon today.
To the extent that antenuptial agreements can reduce those uncertainties and minimize those costs without impairing the legislative goals embodied in our statutes, they should be welcomed. To the extent that parties who are about to marry make rational attempts to guard against what their intelligence (and sometimes their experience) tells them is an unpleasant but all too real possibility, they should be encouraged. Their agreement as to what will happen if their marriage does not succeed should be granted the same favorable treatment as a property settlement agreement which is negotiated and executed after a marriage has fallen on hard times. Certainly a judicial decision which would invalidate such agreements ipso facto, would be irrational and destructive. The reasoning that once found them contrary to public policy has no place in today's matrimonial law.
In sum, any possibility that New Jersey might regard antenuptial agreements fixing post-divorce rights and obligations as generally void or unenforceable, or that the courts of this State will grant them only grudging acceptance, should be discarded.[3] Such agreements, subject to the conditions discussed below, should be welcomed and encouraged, and the language of our Supreme Court in Petersen v. Petersen, 85 N.J. 638, 645-646 (1981), which dealt with property settlement agreements incident to a divorce action, should be viewed as equally applicable to antenuptial agreements covering those same issues:
Voluntary accommodations regarding matrimonial differences are highly desirable and make a major contribution to the fulfillment of the `strong public policy favoring stability of arrangements'.... Thus to the extent that the parties have developed comprehensive and particularized agreements responsive *29 to their peculiar circumstances, such arrangements will be entitled to judicial deference and greatly assist the judiciary in the discharge of its supervisory role in such matters.
The Court's reference in Petersen to the parties' developing an agreement "responsive to their peculiar circumstances" points up the essential precondition to the validity and enforceability of antenuptial agreements: full disclosure by each party as to his or her financial conditions, including the nature and extent of assets, income, and anything else which might bear on the other party's conclusion that the proposed agreement is fair, and his or her decision to enter into the agreement. Just as a property settlement agreement executed in connection with a judgment of divorce must be premised on full disclosure and full awareness of the other party's condition, cf. Hipsley v. Hipsley, 161 N.J. Super. 119 (Ch.Div. 1978); and see Colson v. Colson, 215 Neb. 452, 339 N.W.2d 280 (Neb.Sup. Ct. 1983), so too, the rationale for enforcing antenuptial agreements can apply only if there is that full disclosure, or if disclosure is unnecessary because the information has already been obtained from some other source.
In fact, full disclosure is even more important in connection with an antenuptial agreement than with a property settlement agreement executed as part of a divorce settlement. The property settlement agreement comes at a time when relations have already deteriorated. Discovery is available, parties usually deal at arms length and the proceeding  almost by definition  is adversarial.
The antenuptial agreement, on the other hand, often comes when the relationship is at its closest, when the parties are least likely to be cautious in dealing with each other and when the relationship is instinct with that trust and confidence which  in comparable situations  has called forth a requirement for full and complete disclosure as a prerequisite to any binding contractual relationship. See, e.g., Liberty Title and Trust Co. v. Louis Plews, 6 N.J. 28 (1950) (trustee and beneficiary); Jay Eliasberg v. Standard Oil Co., 23 N.J. Super. 431 (Ch.Div. 1952) *30 (corporate directors and stockholders); Carluccio v. 607 Hudson Street Holding Company, Inc., 141 N.J. Eq. 449 (E. & A. 1948) (agent and principal).
Thus, the claim by defendant here that plaintiff was represented by independent counsel is not enough. Such representation might support an argument that plaintiff knew the meaning of the agreement she was signing. Indeed, the agreement is relatively simple and there would seem no basis for a claim to the contrary. Awareness of the meaning of the words in the agreement, however, does not demonstrate that plaintiff knew she was marrying a man with assets of at least $5,000,000 and an annual income in excess of $250,000. It does not demonstrate that with such information she nevertheless expressed herself as willing to accept a total of $100,000 and (as defendant contends) no alimony of any kind if the marriage did not succeed. It is altogether possible that plaintiff might have rejected the proposed agreement if full disclosure had indicated to her that the proposal was blatantly unfair. It is even possible that full disclosure might have suggested such a lack of generosity on the part of her intended husband as to call into question her basic decision to marry.
Alternatively, of course, even with full awareness of defendant's financial condition, plaintiff might have determined to sign the agreement and go ahead with the marriage. But only if it can be shown that there was full disclosure can we possibly know the answer to those questions.
Plaintiff also suggests an additional argument addressed in some of the cases noted above and in other discussions of antenuptial agreements: that the agreement may be invalid because it is "unfair". Assuming such "unfairness", but also assuming full disclosure prior to execution of antenuptial agreement, should the agreement be held invalid?
Clearly there must be some level of "unconscionability" which would bar enforcement of an antenuptial agreement no matter what disclosure had been made. An agreement which *31 would leave a spouse a public charge or close to it, or which would provide a standard of living far below that which was enjoyed both before and during the marriage would probably not be enforced by any court. See, e.g., Newman v. Newman, 653 P.2d 728 (Colo.Sup.Ct. 1982).
Absent "unconscionability" however, and assuming full disclosure, it is difficult to see why a divorcing spouse should be able to avoid an agreement signed before marriage simply by showing a substantial difference between his or her rights under the agreement, and what might be awarded by a court in the absence of the agreement. In that sense it would seem that "unfairness" should not be a defense to enforcement of an otherwise valid antenuptial agreement.
Further, as applied to alimony provisions in an antenuptial agreement, a "fairness" test would raise a difficult question as to the meaning of that term in the contest of such an agreement. While Lepis v. Lepis, 83 N.J. 139 (1980), holds that the applicable measure for judicially fixed support is the standard of living during the marriage, there does not seem anything inherently "unfair" in an antenuptial agreement which uses a different standard  perhaps the somewhat lower standard at which one spouse lived before the marriage. While such an agreement might sometimes be unconscionable (particularly in a long term marriage or one with children), that might not be so in other cases. Indeed, assuming full disclosure, if it were shown in the present case that the purpose and effect of the agreement was to hold plaintiff harmless from any loss, and permit her to again live at the reasonably comfortable standard she had enjoyed prior to marrying defendant (albeit somewhat less affluently than she lived during the marriage) it is difficult to see why the agreement should not be enforced.
Although these considerations suggest that "unfairness" probably should not be considered a material issue when dealing with the enforceability of an antenuptial agreement, that question is not now before the court. A final ruling as to the *32 effect of alleged unfairness can best await a full factual hearing at which that conclusory term can be given more substantive content.
Also best left for decision after full factual development is the converse of the last mentioned issue: whether an antenuptial agreement should be enforced if it is found to be "fair" even though there was not full disclosure by the party urging enforcement. In other words, should it be sufficient (as the Florida court indicated in Posner and Del Vecchio) to show either that the agreement was fair or that it was executed after full disclosure had been made?
On its face, at least, it would not seem that such an agreement should be binding upon the parties. Without the full disclosure discussed above, the agreement would represent only the conclusions of one party (the non-discloser) as to what he or she considered a fair agreement. The other party  the one without full information  was by hypothesis not in a position to make that determination. All of the reasons that argue for the enforceability of antenuptial agreements are absent if one of the two parties has not executed the agreement with full knowledge of all the facts available to the other.
Further, a party's execution of an antenuptial agreement represents his or her waiver of the right to have a court resolve questions of alimony and equitable distribution. A waiver is frequently defined as the intentional relinquishment of a known right. See, e.g., Giorno v. South Brunswick Township, 170 N.J. Super. 162 (App.Div. 1979); Allstate Insurance Company v. Howard Savings Institution, 127 N.J. Super. 479 (Ch.Div. 1974). Here the "right" in question can properly be considered "known" only if there is full awareness of the other party's income and assets, since those facts are critical elements in determining the potential awards of alimony and equitable distribution which the signer of the agreement is being asked to "waive."
*33 As noted, however, that issue need not, and probably should not, be finally resolved at this time. We turn next, therefore, to the final issue presented: burden of proof.
A rule whereby the party seeking to enforce an antenuptial agreement must bear the burden of proving there was full financial disclosure to the other party will place the burden on the person who can most easily fulfill it. Thus, in this case, it is the defendant who knows what his income and assets were and are. It will be much easier for him to demonstrate what he told his wife and what the facts were, than it would be for her to establish the negative of that proposition: that her husband did have certain assets or income and failed to tell her about them.
As a practical matter, and looking to the future use of antenuptial agreements, disclosure and proof thereof should be relatively simple. The easiest device would probably be a schedule annexed to the agreement setting out, at least in general terms and with approximate values, the assets of the parties as well as their income over the past few years. Normally such disclosure should be adequate although, of course, there may be cases where additional information would be required. With such a procedure, the presentation and attempted enforcement of the antenuptial agreement at a later date would automatically bring before the court the statement of disclosure (as part of the agreement) and the proponent thereof would need only to present evidence that such was indeed his or her condition at the time the agreement was signed.
Turning now to the facts of the present case, the principles set out above indicate that the antenuptial agreement here will be enforced if, but only if, the defendant made full and complete disclosure of his income and assets to plaintiff at or before the signing of that agreement. Plaintiff alleges that there was no such disclosure and defendant has not demonstrated that plaintiff's claim is without merit. Accordingly, there is a bona fide issue as to a material fact and summary *34 judgment dismissing portions of plaintiff's complaint is inappropriate. Judson v. People's Bank and Trust Co. of Westfield, 17 N.J. 67 (1954).
Further, since defendant has the burden of demonstrating that there was disclosure, and since  at least at this stage of the case  that burden has not been met, the antenuptial agreement will not serve to bar plaintiff's request for pendente lite alimony. Since defendant has not disputed plaintiff's claims as to living expenses and income, an award of pendente lite alimony will be based on the difference between plaintiff's asserted needs  $3,276.00 per month  and her monthly income of $1,866.00. The difference, and the amount presumptively required by plaintiff, is $1,410.00 per month which is clearly within defendant's means. An order to that effect will be entered.
A further word should be said concerning the pendente alimony issue. It is not at all clear that the antenuptial agreement here was intended to bar alimony  whether pendente lite or permanent. The language is cast in terms of property rights and seems primarily focused on assets and possible equitable distribution. Since, for the reasons set out above, pendente lite alimony is to be awarded in any event, the proper interpretation of the agreement need not be resolved at this time and may await final hearing.
Finally, if at final hearing it should develop that there was full and adequate disclosure so as to validate the antenuptial agreement, and if it also develops that the agreement should be held to bar the pendente lite alimony hereby awarded, a proper adjustment can be made to credit defendant (against the $100,000.00 he will be required to pay to plaintiff if the agreement is upheld) for any pendente lite payments he was improperly required to make.
Plaintiff's attorneys will be awarded a pendente lite counsel fee on this application, subject to the same possible later adjustment if it is determined at final hearing that defendant *35 should not be responsible therefor. A certification of services may be submitted together with an appropriate form of order.
NOTES
[1] Although it has received scant attention and was not mentioned by either party in this action, it should be noted that N.J.S.A. 37:2-4 states that "All contracts made between persons in contemplation of marriage shall remain in full force after such marriage takes place". That statute was enacted in 1877 and cannot reasonably be said to address the present issue. Neither the statute itself, nor any case in which it is discussed refers to post-divorce rights and obligations.
[2] From 1965 to 1979 divorces and annulments in New Jersey increased from 5.6 to 23.5 (per 1,000), an increase of over 400%. See U.S. Department of Commerce, Bureau of the Census, Statistical Abstract of the United States, 103d edition at 84 (1982-83). In Turner v. Turner, 158 N.J. Super. 313, 316 (Ch.Div. 1978), the court noted that one out of 1.8 marriages in New Jersey ends in divorce.
[3] Antenuptial agreements should, of course, be regarded as subject to modification by reason of "changed circumstances" in the same manner as property settlement agreements. Cf. Lepis v. Lepis, 83 N.J. 139 (1980).