725 A.2d 56 (1999)
319 N.J. Super. 185
Antonio PACELLI, Plaintiff-Respondent/Cross-Appellant,
v.
Francesca PACELLI, Defendant-Appellant/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued January 11, 1999.
Decided March 9, 1999.
*57 Toby Solomon, Livingston, for defendant-appellant/cross-respondent (Ms. Solomon and Kathleen Morehouse, New York City, on the brief).
Jeffrey P. Weinstein, Roseland, for plaintiff-respondent/cross-appellant (Weinstein, Penza & Snyder, attorneys; Mr. Weinstein, of counsel; Mr. Weinstein, Rachel Zakarin and Angelo Sarno, on the brief).
Before Judges PETRELLA, D'ANNUNZIO and CUFF.
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
At issue is the enforceability of a mid-marriage agreement resolving issues of equitable distribution and alimony in the event of a divorce. This appears to be a case of first impression in New Jersey. The trial court, after a plenary trial, determined that the agreement was enforceable. An order entered on October 25, 1996 memorialized that determination. Thereafter, on July 9, 1997, the court entered a judgment of divorce. The wife, defendant Francesca Pacelli, appeals.
The parties were married in June 1975. The husband, plaintiff Antonio Pacelli, was forty-four years of age at that time; defendant was twenty. Defendant had been born in Italy, but migrated to the United States when she was fourteen. Plaintiff was a builder and a real estate developer. He also owned a restaurant at the time of the marriage. Plaintiff testified that he was worth three million dollars when the parties married, but he presented no documents to support that statement.
Two children were born of the marriage. Tony was born in 1976 and Franco was born in 1977. The family lived in a very substantial home in Passaic County and enjoyed a high standard of living. Their income tax returns showed a gross income of $540,000 in 1984 and $476,000 in 1985. Defendant contributed no income to the family.
*58 In mid-1985, plaintiff informed defendant that he would divorce her unless she agreed to certain terms regarding their economic relationship. To punctuate his demand, plaintiff moved out of the marital bedroom and into an apartment above their garage.
At or about the time he made this demand on defendant, plaintiff sought the advice of matrimonial counsel Barry Croland. Croland testified that he advised plaintiff of his economic exposure for equitable distribution and alimony. According to Croland, plaintiff admitted to a net worth of $4.7 million in 1985, $1.7 million more than he had when he married defendant. Croland informed plaintiff that any agreement between plaintiff and defendant, to be enforceable, had to be fair and made only after full disclosure of relevant information regarding the parties' assets. Croland also informed plaintiff that defendant should be represented by counsel.
The record establishes that defendant did not want a divorce. Upon being informed of plaintiff's demand and suggestion that she should retain counsel, defendant consulted matrimonial lawyer, Gary Skoloff, in July 1985. Skoloff advised defendant of her rights in the event of a divorce.
Defendant's next contact with Skoloff was in the fall of 1985. At that time, she informed Skoloff that plaintiff was going to pay her $500,000 in the event of a future divorce, as full satisfaction of plaintiff's equitable distribution and alimony obligations. Skoloff advised her not to sign such an agreement and that if she divorced plaintiff in 1985, a judge would award her much more than $500,000 in equitable distribution and alimony. Defendant did not take Skoloff's advice. Defendant informed Skoloff that she wanted to preserve the marriage and did not want her children to grow up in a broken family. Skoloff testified that defendant told him that she would sign anything in an effort to preserve the marriage.
Thereafter, Skoloff received a form of agreement drafted by Croland and the family's tax returns for four years, through 1984. Croland also provided Skoloff with financial statements. Skoloff testified that the agreement was not negotiable and it was presented as an agreement to be signed as is, otherwise there would be a divorce.
Defendant signed the agreement in February 1986 and plaintiff signed it in March 1986. The parties resumed their marriage until 1994, when plaintiff filed a complaint for divorce. In 1994, plaintiff's assets totaled $14,291,500. He had a net worth of $11,241,500.
The issues are: whether the agreement was the result of coercion or duress and, therefore, unenforceable; and whether the agreement was unfair and, therefore, unenforceable. Regarding the fairness issue, a subsidiary issue is whether the agreement should be measured for fairness as the facts were in 1985 or as the facts were in 1994 when plaintiff filed his divorce complaint. Defendant also contends that in 1989, she and the plaintiff agreed to nullify the agreement and that plaintiff and she signed a paper to that effect. Defendant could not produce the signed paper at the trial, contending that plaintiff had stolen it from her and destroyed it.
The trial court, in a comprehensive letter opinion, summarized the evidence, made specific findings of fact and determined that the agreement was not the result of coercion or duress, that it was fair as measured in 1985, and that defendant's contention that the parties had nullified the agreement was not credible.
The court's determination that the parties had not nullified the agreement is supported by substantial credible evidence in the record and it is affirmed. Pascale v. Pascale, 113 N.J. 20, 33, 549 A.2d 782 (1988); Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). The other issues are more difficult.
Pre-nuptial agreements made in contemplation of marriage are enforceable if they are fair and just. D'Onofrio v. D'Onofrio, 200 N.J.Super. 361, 366-67, 491 A.2d 752 (App.Div.1985); DeLorean v. DeLorean, 211 N.J.Super. 432, 435, 511 A.2d 1257 (Ch. Div.1986); Marschall v. Marschall, 195 N.J.Super. 16, 28, 477 A.2d 833 (Ch.Div.1984). Agreements made at the end of a marriage in contemplation of a divorce and to *59 fix each party's economic rights on entry of a divorce judgment are enforceable if "fair and equitable." Lepis v. Lepis, 83 N.J. 139, 148-49, 416 A.2d 45 (1980); Petersen v. Petersen, 85 N.J. 638, 642, 428 A.2d 1301 (1981); Berkowitz v. Berkowitz, 55 N.J. 564, 569, 264 A.2d 49 (1970); Schlemm v. Schlemm, 31 N.J. 557, 581-82, 158 A.2d 508 (1960).
In Marschall v. Marschall, supra, Judge Lesemann, sitting in chancery, recognized a contextual difference between pre-nuptial agreements and agreements made on the demise of the marriage. "The property settlement agreement comes at a time when relations have already deteriorated. Discovery is available, parties usually deal at arms length and the proceedingalmost by definitionis adversarial." 195 N.J.Super. at 29, 477 A.2d 833. A pre-nuptial agreement, however, is reached when the parties are not adversaries, "when the relationship is at its closest, when the parties are least likely to be cautious in dealing with each other." Ibid.
We are persuaded that the mid-marriage agreement in the present case differs from pre-nuptial agreements and property settlement agreements made at a marriage's termination. It was entered into before the marriage lost all of its vitality and when at least one of the parties, without reservation, wanted the marriage to survive. Plaintiff also wanted to continue the marriage, but only on his terms.
Here, unlike the pre-nuptial bride, Francesca Pacelli had entered into the legal relationship of marriage when her husband presented her with his ultimatum. Moreover, the marriage had produced two children. Thus, defendant faced a more difficult choice than the bride who is presented with a demand for a pre-nuptial agreement. The cost to Francesca would have been the destruction of a family and the stigma of a failed marriage. She testified on several occasions that she signed the agreement to preserve the family and to make sure that her sons were raised in an intact family.
The mid-marriage agreement in this case also differs from a property settlement agreement made when the marriage has died. In that case, as Judge Lesemann perceptively observed in Marschall, each party, recognizing that the marriage is over, can look to his or her economic rights; the relationship is adversarial.
Our point is that the context in which plaintiff made his demand was inherently coercive. Defendant's access to eminent counsel is of little relevance because her decision was dictated not by a consideration of her legal rights, but by her desire to preserve the family.
We have found no decision in New Jersey or other jurisdictions addressing the enforceability of this type of agreement. Courts have addressed "reconciliation" agreements, however.
Nicholson v. Nicholson, 199 N.J.Super. 525, 489 A.2d 1247 (App.Div.1985), involved a reconciliation agreement made after the couple had separated due to the husband's second episode of infidelity. As consideration for resumption of the marriage, the wife demanded and received a conveyance of the marital home from the husband. Previously, the couple had held title as tenants by the entirety. Twelve years later, the couple divorced and the trial court determined that the home was not subject to equitable distribution, thereby enforcing the reconciliation agreement.
On appeal, we observed that "[i]n some circumstances a reconciliation agreement will be enforced if it is fair and equitable." Nicholson, supra, 199 N.J.Super. at 530, 489 A.2d 1247. A prerequisite to enforcement is a requirement that "the marital relationship has deteriorated at least to the brink of an indefinite separation or a suit for divorce." Id. at 531, 489 A.2d 1247. Under such circumstances a "promise that induces a reconciliation will be enforced if it is fair and equitable." Ibid. We summarized additional factors that must be considered by the trial court in evaluating such an agreement:
Before a reconciliation agreement will be enforced, the court must determine that the promise to resume marital relations was made when the marital rift was substantial. If the agreement was oral and enforcement is sought of a promise to convey real estate, there must also be compliance *60 with the statute of frauds. Carlsen, 49 N.J.Super. at 134-138 [139 A.2d 309]. The court may have to resolve disputes over the terms of the agreement. Carlsen, 49 N.J.Super. at 138-139 [139 A.2d 309]; Schichtel v. Schichtel, 3 Ark.App. 36, 621 S.W.2d 504, 507-508 (1981). The court must consider whether the circumstances under which the agreement was entered into were fair to the party charged. D'Arc v. D'Arc, 164 N.J.Super. 226, 238-239 [395 A.2d 1270] (Ch.Div.1978), rev'd in part, aff'd. in part, 175 N.J.Super. 598 [421 A.2d 602] (App.Div.1980), certif. den., 85 N.J. 487 [427 A.2d 579] (1981), cert. den., 451 U.S. 971, 101 S.Ct., 2049, 68 L.Ed.2d 350 (1981). The terms of the agreement must have been conscionable when the agreement was made. See Wertlake v. Wertlake, 137 N.J.Super. 476, 482 [349 A.2d 552] (App.Div.1975). The party seeking enforcement must have acted in good faith. See Marshall v. Marshall, [166 W.Va. 304] 273 S.E.2d 360 (W.Va.Ct.App.1981). Cf. Sullivan v. Sullivan, 79 Ill.App.2d 194, 223 N.E.2d 461 (1967) (court will not enforce conveyance made in exchange for wife's fraudulent promise to return home). Changed circumstances must not have rendered literal enforcement inequitable.

[Id. at 532, 489 A.2d 1247.]
We remanded to the trial court for further consideration.
Two of our observations in Nicholson are particularly relevant in the present case. In Nicholson, we required a showing that the marital relationship had genuinely deteriorated "to the brink of an indefinite separation or a suit for divorce."
Here, the testimony of plaintiff and his lawyer establish that plaintiff's primary interest was financial. Plaintiff wanted an agreement that would limit his exposure to his wife's economic demands. Plaintiff testified on direct that
I felt uncomfortable if I didn't haveI had to have an agreement, because I was involved in so many of these deals, and I just wanted to operate with a clear head. And I didn't want to have to worry about any day this thing could blow up, and I could be in a real bind.
Plaintiff returned to this theme later in his direct examination:
Well, I just wasn't comfortable, you know, knowing that the marriage is always on asort of on the rocks. And I wanted to put everything in its [perspective]. I wanted to know that if I was going to go into a deal, I could not worry about, you know, getting involved in all kinds of legal stuff.
Plaintiff stated that the DeLorean case, involving a pre-nuptial agreement "gave me an idea to use some kind of an agreement to ... keep the marriage intact, and still operate and being able to do business."
Plaintiff's lawyer, Croland, testified that plaintiff's purpose "was to stay married, that's what he wanted." But he wanted to understand his financial exposure in the event of a divorce. Croland also testified that during their initial conference Pacelli stated that he had "new deals coming his way," and he was concerned that his wife "not share beyond a certain point."
The evidence, therefore, supports an inference that the marital "crisis" was artificial, created by plaintiff to take advantage of his wife's dedication to the marriage and her family.
The second relevant standard in Nicholson is that the agreement must be fair and equitable when made and when it is sought to be enforced. We will allude to this standard later in this opinion.
The majority view in other jurisdictions is that "[a]n agreement the object of which is to restore marital relations after a separation has taken place will generally be upheld." 17 C.J.S. Contracts, § 236 (1963). According to Annotation, Validity and enforceability of agreement designed to prevent divorce, or avoid or end separation, 11 A.L.R. 277 (1921), a "contract between a husband and wife, made when the spouses are separated for legal cause, and providing for the payment of a consideration for their reunion, is, by weight of authority, enforceable by either spouse." The annotation offers the policy reasons for the majority and minority views:

*61 In most jurisdictions, an agreement of that character is held not only to be unobjectionable in this respect, but to promote the stability of the relation, as it purports to do. On the other hand, several courts have considered such an agreement as mischievous, because it offers an inducement for domestic discord to persons who are willing to occupy this vantage ground for the purpose of obtaining pecuniary or other concessions.

[Ibid.]
Flansburg v. Flansburg, 581 N.E.2d 430 (Ind.App.1991), is an example of the majority view regarding reconciliation agreements. There, the court affirmed enforcement of a reconciliation agreement made after the wife had filed a petition for dissolution of the marriage. The court concluded that "it was entirely appropriate for the trial court to apply the law of antenuptial contracts" to the reconciliation agreement. 581 N.E.2d at 433. The court cited a number of opinions from other jurisdictions recognizing the validity of reconciliation agreements and treating them "in much the same way as antenuptial agreements." Id. at 434.
Judge Garrard dissented, in part because in his opinion the policy reasons supporting the validity of antenuptial agreements did not apply. Id. at 437.
In Hoyt v. Hoyt, 213 Tenn. 117, 372 S.W. 2d 300 (1963), the Supreme Court of Tennessee held that a reconciliation agreement made after the wife had filed a divorce action was not void or contrary to public policy. In a comprehensive opinion the court reviewed authorities representing the minority and majority views. It analogized the reconciliation agreement to antenuptial agreements and property settlements made in conjunction with a pending or contemplated divorce proceeding. 372 S.W.2d at 303-04.
Mathie v. Mathie, 12 Utah 2d 116, 363 P. 2d 779 (1961) articulated some of the concerns on which the minority view is founded. The court noted that reconciliation agreements "between spouses to fix their property rights inter se during coverture are generally not held to be so absolute as to prevent a court under its equity powers in divorce actions from doing that which justice and equity require for the interest and welfare of the parties." 363 P.2d at 782-83. The court then stated:
Some cases which contain language to the effect that agreements of that kind are valid state that they should be favored because they tend to encourage reconciliation and preservation of the family. But it is obvious that this is a two-edged sword. Other well-considered cases disavow such contracts, reasoning that the rights and duties in the marriage relationship are fixed by law and that the parties should not be encouraged to abrogate or avoid them by using family strife to bargain themselves into positions of advantage; that doing so bears the seeds of further strife; whereas there should be a forgetting and forgiveness of past difficulties and a fresh re-establishment of the obligations and duties of the marriage as originally intended.

[363 P.2d at 783 (Emphasis added).]
In Stahl v. Stahl, 221 N.Y.S.2d 931 (Sup. Ct.1961), modified on other grounds, 16 A.D.2d 467, 228 N.Y.S.2d 724 (1962), the court denied enforcement of an agreement between husband and wife made before separation, but when the wife was contemplating a separation. The court distinguished the agreement from reconciliation agreements made while the parties were separated and involved in divorce proceedings. The court held that an agreement "to separate in the future, or which has for its object the future separation of the parties or provides for a possible separation in the future ... is void as against public policy." 221 N.Y.S.2d at 938. The court noted, however, that reconciliation agreements that reunite separated parties to resume their marriages were enforceable.
We are persuaded that placing a mid-marriage agreement in the same category as a pre-nuptial agreement is inappropriate. As previously indicated, the dynamics and pressures involved in a mid-marriage context are qualitatively different. Similarly, there are significant differences between a mid-marriage agreement and a property settlement *62 agreement made in the context of termination of the marriage. In the latter circumstances, knowing that the marriage is over, though one party may wish to continue it, each party can pursue his or her economic self interest.
Mid-marriage agreements closely resemble so-called reconciliation agreements. We must be aware, however, that such circumstances are pregnant with the opportunity for one party to use the threat of dissolution "to bargain themselves into positions of advantage." Mathie, supra, 363 P. 2d at 783.
We need not decide whether such agreements are so inherently and unduly coercive that they should not be enforced, though we conclude that, at the very least, they must be closely scrutinized and carefully evaluated. In the present case, we conclude that the terms were not fair and just.
Defendant contends that the fairness of the agreement must be measured as of 1994 when plaintiff sought to enforce it. At that time, plaintiff's net worth was approximately $11,000,000. Defendant's argument relies in part on the Uniform Premarital Agreement Act, N.J.S.A. 37:2-31 to -41. It provides that an agreement is not enforceable if it was "unconscionable at the time enforcement was sought." N.J.S.A. 37:2-38b. The Act, however, only applies to premarital agreements and, consequently, it does not control the present case.
Defendant limits her attack on the agreement's fairness to the circumstances existing in 1994. We conclude, however, that the agreement was unfair in 1986, when it was signed. The trial court determined that the agreement was fair and equitable when it was made because the agreement gave the wife "approximately 32% of the husband's net worth subject to equitable distribution in 1985." The agreement promised defendant $500,000 in the event of a divorce. Additionally, it called for immediate payment on execution in the amount of $40,000. Thus, $540,000 of the presumed marital estate of $1,700,000 is 32%.
But, the court's numbers are wrong, the court and counsel having been misled by plaintiff's creative accounting. Plaintiff introduced into evidence a financial statement showing a "net worth" of $4,786,800 in 1985, or $1,786,000 more than he claimed to be worth in 1975 when he married defendant.
The financial statement listed assets worth $7,696,200. Liabilities totaled $1,643,300. Plaintiff's net worth, therefore, was $6,053,100. Plaintiff and his accountant reached the net worth figure of $4,786,800 by deducting $1,266,100 in potential income taxes due upon a hypothetical sale of those of plaintiff's assets whose value exceeded their basis. We know of no authority to justify that deduction in determining net worth in a matrimonial context or in the circumstances in this case. Indeed, in Orgler v. Orgler, 237 N.J.Super. 342, 568 A.2d 67 (App.Div.1989) we held that "hypothetical tax consequences upon the future sale or transfer of marital assets should not be deducted from present value for equitable distribution purposes." Id. at 355, 568 A.2d 67. We recognized, however, that tax consequences may be considered in the distribution of a marital estate. Id. at 356, 568 A.2d 67. See Stern v. Stern, 66 N.J. 340, 348, 331 A.2d 257 (1975).
There is nothing in the record to suggest that assets would have to have been sold in 1985 to satisfy an equitable distribution order. Plaintiff's assets included cash in the amount of $622,600, Treasury bills in the amount of $503,500, marketable securities in the amount of $102,500, and mortgage receivables in the amount of $238,400. Real property does not necessarily have to be sold to satisfy a spouse. It can be distributed in kind, or it can be refinanced to provide cash equivalency. Moreover, as a result of the Tax Reform Act of 1984, effective July 18, 1984, a transfer between spouses or former spouses, "incident to the divorce" does not result in the recognition of "gain or loss." 26 U.S.C.A. § 1041.
We conclude that in 1985 the marital estate was $3,000,000, not $1,700,000. Thus, the $540,000 provided in the agreement was 18% of the marital estate. Plaintiff's lawyer, Croland, testified that he had advised plaintiff that he could expect "the probable range of equitable distribution could be somewhere around ... one-third. Could be less, it could be more." Skoloff testified that an equitable *63 distribution range would be between thirty and forty percent of post-marital assets. Thus, the $500,000 buy out was approximately half of a potential equitable distribution award, using the low end of the range.
The $500,000 also purchased defendant's waiver of alimony. An alimony award in 1985 would have been substantial, perhaps approaching six figures. Plaintiff's annual income in 1984 and 1985 averaged $500,000. The parties lived well. They lived in an expensive home, drove luxury automobiles and vacationed at some of the most desirable destinations. Plaintiff estimated that defendant spent $20,000 to $30,000 per year on clothing from stores such as Bergdorf Goodman. Their son, Tony, went to Deerfield Academy, and Franco went to Choate.
Plaintiff was fifty-four years of age when the parties signed the agreement. According to the table of life expectancy in the Rules Governing the Courts of the State of New Jersey for 1986, plaintiff had a life expectancy of approximately twenty years. Thus, unless defendant remarried, plaintiff would have been paying a substantial annual alimony for a long time.
As an additional example of the oppressiveness of the agreement, though not central to our decision, we note that in Article XIII, the wife "accepts the provisions" in the agreement "in full settlement and satisfaction of any and all claims" against the husband's estate "including ... all rights of dower, all homestead rights, all rights to widow's allowance and support, and all rights under the laws of testacy and intestacy ... to which the wife is or may be entitled to ... by reason of widowhood in the event of the husband's demise or otherwise." Thus, in the event of plaintiff's death during marriage to defendant, she waived even her right to a surviving spouse's elective share of the augmented estate under N.J.S.A. 3B:8-1. We note that under the agreement, only the entry of "a Final Judgment of Divorce" triggers the obligation to pay the $500,000 to defendant.
Defendant argues that the agreement should be measured for fairness in 1994, when plaintiff sought to enforce it. In Nicholson, supra, we observed that in evaluating a reconciliation agreement "[c]hanged circumstances must not have rendered literal enforcement inequitable." 199 N.J.Super. at 532, 489 A.2d 1247. We are persuaded that the close scrutiny and careful evaluation of mid-marriage agreements also requires consideration of the agreement's impact when enforced. This is so for at least two reasons. A marriage may survive for many years after such an agreement, as in this case. During that time, the family may continue to prosper, due in part to the contribution of a spouse, such as defendant, in her capacity as mother, homemaker and helpmate. It may be inequitable to preclude her participation in post-agreement wealth.
Moreover, post-agreement prosperity may elude the parties. A family's assets may be worth less at the time of enforcement than when the agreement was executed. In that case, enforcement of the agreement may be inequitable to the obligor.
It is apparent that the agreement is also unfair when measured in 1994. At that time, plaintiff's net worth exceeded $11,000,000, and post-martial assets were $8,000,000. Thus, $540,000 is approximately seven percent of the 1994 assets. The parties built a home at the Saint Andrews Club in Florida after executing the agreement. It is in joint names and defendant is entitled to one-half of the $1,200,000 equity, or $600,000. Even considering this asset, defendant's distribution is less than fifteen per cent of the marital estate. In light of the inherently coercive circumstances leading to the agreement, the result is unfair, inequitable and unenforceable. The trial court, on remand, must make determinations regarding equitable distribution and alimony, and other ancillary economic issues, if any.
Defendant also contended below that she had invested the initial $40,000 payment in one of plaintiff's real estate projects called Della Presta. The trial court ruled that defendant "has failed to sustain her burden of proof with respect to any alleged ownership interest in said property." This determination *64 is supported by evidence in the record and it is affirmed.
Defendant's trial counsel sought counsel fees in the amount of $137,188.99. The court awarded defendant $35,000. Defendant contends that the counsel fee award was inadequate. The trial court did not adequately explain why it limited the award to $35,000, other than noting that defendant "has present assets totaling $385,000 and will receive a substantial sum from the sale of the house at St. Andrews." Perhaps the court was influenced by the fact that defendant's attempt to invalidate the agreement had failed. In any event, we vacate the counsel fee award because of the outstanding issues regarding equitable distribution and alimony. On remand, counsel fees shall be considered anew when all other issues are resolved.
Plaintiff cross-appealed. He contends that the court erred in not crediting $166,000 in court-ordered pendente lite support payments against the $500,000 obligation contained in the agreement. Plaintiff also contends that the court erred in admitting tape recordings of telephone conversations which defendant offered in support of her contention that they had agreed to nullify the agreement. Both contentions are moot, and the cross-appeal is dismissed.
The order dated October 25, 1996, determining that the agreement is enforceable, is reversed. Paragraph two of the July 9, 1997 divorce judgment, awarding counsel fees in the amount of $35,000, is vacated. In all other respects the judgment of divorce is affirmed. The case is remanded for further proceedings consistent with this opinion.