OPINION OF THE COURT
Ralph Yachnin, J.
Motion by plaintiff husband (Husband), made by notice of motion, dated February 5, 1992, and ultimately submitted for decision on December 18, 1992,[1] for an order dismissing the defendant wife’s (Wife) second and third counterclaims on the grounds that they fail to state a cause of action, and the cross motion by the Wife, made by notice of cross motion, dated October 19, 1992, for an order, pursuant to CPLR 3025 (b), granting the Wife leave to amend her second and third counterclaims, should the court find that the same fail to state a cause of action, are disposed of as follows:
In this action, both parties seek a divorce.
*370 In the Wife’s second counterclaim, she alleges that during the course of the marriage, the Husband has committed acts of cruelty and violence upon her; that in 1981, she commenced an action for divorce against the Husband; that in or about January of 1982, the parties agreed to reconcile and discontinue that action; that the Husband would not reconcile with her unless she signed a postnuptial agreement providing for equitable distribution of the parties’ assets and also providing for support and maintenance in the event of divorce or separation; that the parties did, on or about January 22, 1982, execute such an agreement (the 1982 agreement); that the 1982 agreement expired at the end of five years and has thereby terminated; that the Wife was "by duress, undue influence, coercion and fraudulent representation practiced upon her by the [Husband], induced to and did execute the January 22, 1982 agreement”; that she would not have signed the 1982 agreement but for the duress and the fraud practiced upon her by the Husband; that the provisions of the 1982 agreement were unfair and unreasonable at the time of making and are presently unconscionable and will be so at the time of entry of final judgment; and that the provisions of the 1982 agreement were and are the product of force, duress, coercion, fraud and overreaching and were and are unfair, unequitable and unconscionable and should be declared null and void.
In her third counterclaim, the Wife reasserts that she was subjected to acts of cruelty and violence and has continually feared for her safety and well-being; that in January of 1983, the Husband told her that he would agree to adopt a child; that the evening before the parties were scheduled to fly to Texas to finalize the adoption, the Husband came home with his father and presented her with a purported postnuptial agreement and threatened the Wife that unless she signed it, he would not go to Texas and finalize the adoption; that the Husband did go to Texas to finalize the child’s adoption but did not speak to her on the way to Texas except to say that the Wife better sign the agreement when the parties arrived back home; that upon the parties’ return from Texas, the Husband told the Wife that if she did not sign the postnuptial agreement, the adopted child would "never have anything, that he would sell the parties’ condominium so that the [Wife] and the child would never have a permanent home and that he would divorce the [Wife]”; that the Wife was frightened that "the authorities” would take the child away from her if *371 the parties were divorced; that the Wife "was by the duress, coercion, undue influence and fraudulent representations practiced upon her by the [Husband] induced to and did execute said purported post-nuptial agreement dated July 18, 1983” (the 1983 agreement); that the Wife would not have executed the 1983 agreement but for the coercion, duress, and fraud of the Husband; and that the 1983 agreement was and is the product of force, duress, coercion, fraud and overreaching and is unfair, unequitable and unconscionable.
While the Husband’s notice of motion is addressed merely to an alleged failure to state a cause of action, the supporting motion papers clearly address not only CPLR 3211 (a) (7) but also dismissal based upon CPLR 3211 (a) (5), specifically, the Statute of Limitations bar. The court will address the Statute of Limitations issue first. It was addressed by both parties in their respective motion papers.
It is the Husband’s contention that the Wife’s failure to attack either of the aforesaid postnuptial agreements within six years from the making thereof bars her two causes of action to declare them null and void upon the grounds specified above. This court agrees. The second and third counterclaims contained in the Wife’s answer are hereby dismissed.
It is undisputed that if a Statute of Limitations bars the two counterclaims herein, it would be a six-year Statute of Limitations (CPLR 213).
In support of his contention that the subject counterclaims are barred by the six-year Statute of Limitations, the Husband cites Pacchiana v Pacchiana (94 AD2d 721 [2d Dept 1983]), a case in which the Court dealt with an antenuptial agreement. The following quote from Pacchiana (supra) is relevant here: "An antenuptial agreement is, of course, a contract [citations omitted]. If a party’s manifestation of assent to a contract is induced by duress or undue influence, the contract is voidable by that party [citations omitted] and the right to rescind accrues upon the execution of the contract [citations omitted]. We therefore reject plaintiffs contention that an antenuptial agreement is executory until the death of either spouse and that no cause of action to void it can accrue until then. While continuing duress or undue influence may toll a Statute of Limitations [citations omitted], the instant suit is barred by the six-year Statute of Limitations relative to equity actions, since the asserted coercion ceased upon the execution of the agreement [citations omitted]. Moreover, even if the complaint *372 can be construed as alleging fraud by the husband in misrepresenting his assets, it is clear that the plaintiff discovered or should have discovered the fraud within a short time after the marriage. Thus, even a claim of fraud would be untimely since the action was not commenced within six years after commission of the fraud or within two years after its discovery [citations omitted]”. (Emphasis added.)
The Wife asserts that the Statute of Limitations has not expired, and for this proposition, she cites Lieberman v Lieberman (154 Misc 2d 749 [Gangel-Jacob, J.]). In the Lieberman case (supra), as in Pacchiana (supra), the court is also dealing with a prenuptial agreement, as opposed to the postnuptial under consideration in the present action. The court in Lieberman (supra, at 750) states the issue to be as follows: "The important question raised, and I believe as yet undecided by our courts, is should the Statute of Limitations be tolled during the marriage because lawsuits between spouses are not favored. The Uniform Premarital Agreement Act, which has not been adopted in New York State, and numerous other authorities answer the question in the affirmative. This court agrees.” (Emphasis added.) The wife in Lieberman sought to declare the premarital agreement invalid. The husband opposed the wife’s attack on the premarital agreement, relying on Pacchiana (supra). The wife lived under the agreement for over nine years before she attacked it. The husband stated there that the wife’s fraud claim was barred because the Statute was not tolled for any reason.
In Lieberman, unlike in the present case, the court notes (supra, at 751-752) that: "the parties had what appears to be a viable marriage from August 31, 1980 [the date on which they were married] until on or about March 1, 1988 * * * On these facts, applying [the husband’s] view of the law, [the wife] would be compelled, while the parties were still living together as husband and wife in an ongoing marital relationship and before the child of the marriage was even three years old, to review and challenge the premarital agreement or lose that right forever, whether or not such challenge would damage or more likely destroy, the marital relationship. Such a requirement would encourage lawsuits between spouses, dissention and perhaps destruction of the marriage rather than enhancement of the marital relationship and would surely be repug *373 nant to the public policy of this State.”[2] The court goes on to recognize the policy of the State to preserve the marital relationship.
The court in Lieberman also states (supra, at 753-754): "In the face of such long-standing and strong policy considerations, it would be anomalous to say that, irrespective of whether the marriage relationship is viable and continuing, the husband and wife must review their premarital agreement and assume adversarial position with respect thereto within the first six years of their marriage or forever lose their right to challenge the agreement.” (Emphasis added.) And further on in the decision, the court states (supra, at 755) that the Statute of Limitations was tolled "during the time the parties lived together in a continuing marital relationship, and that the statute did not begin to run until March 1988, when the marriage had irretrievably broken down and the parties started living separate and apart.”
Thus, even under Lieberman, a critical factor is the viability of the marriage when dealing with an antenuptial agreement. An antenuptial agreement is considerably different from the kind of posi-nuptial agreement the court is here considering. Naturally, in the present case, the contract is a posi-nuptial, not oroie-nuptial agreement, and this is a significant factor.
This was not a viable marriage from well before the 1982 agreement was executed and continuing on until the present time. The Wife has so stated. In her verified complaint, she alleges that she commenced an action for divorce against the Husband in 1981. The 1982 agreement was for possible reconciliation. Thereafter, the 1983 agreement was executed, again with consideration for a possible divorce or separation and obviously with concern for the viability of the marriage. In addition, the Wife has stated as follows:
"As set forth in my complaint and previous affidavits, throughout our marriage, the [Husband] has physically and mentally abused me.”
"My husband has abused me into submission throughout our marriage.”
"Because of plaintiff’s cruel and violent conduct towards the defendant during the course of the marriage and until the *374 present time, the defendant has continually feared for her safety and well-being.”
In that same affidavit, the Wife states that she agreed to reconcile with the Husband for financial reasons: "I found that I could not survive so in January 1982 when my husband said that he wanted to reconcile, I agreed. However, the Plaintiff refused to reconcile unless I signed a post-nuptial agreement.”
At no time in any document submitted to the court does the Wife unequivocally state that she was forced to sign the 1983 agreement before the Husband would agree to the adoption. The Wife is stating, in effect, that her right to have the adoption (what she wanted) was paramount to the Husband’s right to protect his and his father’s property (what he wanted). It would seem that any coercion regarding the agreement, if any, terminated when the Wife signed it — at least insofar as compulsion to sign that document. The same must be said of the 1982 agreement. (Pacchiana v Pacchiana, supra.)
At all times from and including the divorce action commenced in 1981 through the negotiation and execution of both agreements, as well as after the Wife’s return from the Texas adoption proceeding, the Wife was represented by counsel, albeit different attorneys at different times.
It seems beyond cavil that because of the parties’ inability to have a "calm” marriage, the Husband told the Wife, as the Wife admits, before the adoption trip, that he wanted the Wife to sign the 1983 agreement or he would not adopt the child; however, the Wife acknowledges that the Husband did in fact go to Texas and that she did in fact bring the child back with her, thereby finalizing the adoption. Indeed, there is no allegation that the adoption is not now final.
The Statute of Limitations was never tolled in this case. It would be wrong to hold that the Wife is permitted to take advantage of the Husband by knowingly agreeing to a property distribution which she believed was invalid at the time she signed it, a time when she was represented by counsel. Were this court to hold otherwise would be to condone adoption of a child into what the Wife states was an unhappy marriage where there was an obvious lack of trust at all times. By signing each of the agreements, the Wife represented to the Husband that each agreement was acceptable to her. Again, she was represented by counsel at all times. By *375 permitting her to knowingly enter into the agreement and now, more than eight years later, claim that the agreement was invalid, would itself be unconscionable under the circumstances of this case. The court notes that there has been no showing that either agreement was unfair or unreasonable at the time it was made or that either is unconscionable at this time or would be so at the time of judgment, which, presumably, will be rendered in the not-too-distant future. The complaint is merely a compilation of allegations and conclusions. More is required even without the bar of the Statute of Limitations (CPLR 3016).
The court also notes that it might appear that there is a conflict between the applicable six-year Statute of Limitations and Domestic Relations Law § 236 (B) (3).
Domestic Relations Law § 236 (B) (3) provides as follows: ”3. Agreement of the parties. An agreement by the parties, made before or during the marriage, shall be valid and enforceable in a matrimonial action if such agreement is in writing, subscribed by the parties, and acknowledged or proven in the manner required to entitle a deed to be recorded. Such an agreement may include (1) a contract to make a testamentary provision of any kind, or a waiver of any right to elect against the provisions of a will; (2) provision for the ownership, division or distribution of separate and marital property; (3) provision for the amount and duration of maintenance or other terms and conditions of the marriage relationship, subject to the provisions of section 5-311 of the general obligations law, and provided that such terms were fair and reasonable at the time of the making of the agreement and are not unconscionable at the time of entry of final judgment; and (4) provision for the custody, care, education and maintenance of any child of the parties, subject to the provisions of section two hundred forty of this chapter. Nothing in this subdivision shall be deemed to affect the validity of any agreement made prior to the effective date of this subdivision.” (Emphasis added.) It is clear that there is at least a limitation on the provisions of an agreement insofar as "maintenance or other terms and conditions of the marriage relationship” are concerned. (See the italics above.) If that limitation applies not only to paragraph (3) but also to paragraph (2) of Domestic Relations Law § 236 (B) (3), quoted above, the Statute of Limitations obviously would be tolled until the court determined whether the agreement was fair and reasonable at the time of its making and was not unconscionable at the time of *376 entry of final judgment, at least to the extent necessary to determine whether that standard had been achieved. This issue has been considered in the Practice Commentary to Domestic Relations Law § 236. Professor Scheinkman there writes with respect to the aforementioned limitation contained in paragraph (3) of subdivision (3) of Part (B) as follows: "This phrase [the phrase italicized hereinabove] appears only in clause 3. However, it has been suggested that it was intended by the draftspersons to apply to all four Clauses in subdivision 3, and the more limited wording was due to a clerical error. However, the use of the precise numbering of clauses leaves little room for construction and, since the fair and reasonable and not unconscionable phrase appears only in clause 3 and not in any other clause, the application of the phrase should be limited to clause 3. The prime significance of this construction would be that clause 2 relating to an agreed upon property distribution would not be subject to review for fairness, reasonableness, and unconscionability. Nonetheless, the entire agreement, including any provisions for a property division would be subject to traditional challenges on the ground of fraud and duress, but this is a higher burden to carry. Moreover, if the limited effect of this phrase was due to a clerical error, the Legislative Law can be expected to rectify the mistake. A failure to do so, particularly when the statute has been amended in other respects, may lead to an inference that the Legislature is satisfied with the narrow application of the phrase.” (Practice Commentary, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law C236B:15, at 239-240.) This court agrees with Professor Scheinkman’s analysis and holds that the aforementioned limitation contained in paragraph (3) of Domestic Relations Law § 236 (B) (3) does not apply to property settlements. (Pennise v Pennise, 120 Misc 2d 782, 786-787 [1983]; see also, Goldman v Goldman, 118 AD2d 498 [1st Dept 1986].)
Naturally, to the extent that the agreements here relate to maintenance, they must be in compliance with the aforequoted limitation. Similarly for "other terms” than property distribution terms.
While this court has concluded that the Statute of Limitations bars the causes of action as framed by the Wife in her counterclaims, the court also holds that the agreements (and they are actually one agreement with a modification thereof) may be set aside under the principles enunciated in Christian v Christian (42 NY2d 63 [1977]).
*377 Clearly, the limitation set forth in the Domestic Relations Law is broader and undoubtedly easier to prove than that set forth in Christian (supra). (Goldman v Goldman, supra, at 500.)
The next issue is whether the Wife has "raised a sufficiently strong claim of overreaching and unconscionability to warrant a hearing as to the circumstances surrounding the execution” of the agreements or either of them. (Pennise v Pennise, supra, at 788.) This court holds that she has not thus far done so.
The Wife has asked for the right to amend her pleading; however, the facts contained in her present pleading and her affidavit do not sufficiently show overreaching and unconscionability. With this in mind, the court hereby grants the Wife leave to renew her present motion to amend her counterclaims, with such motion to include a copy of the proposed amended pleadings.
This being an Individual Assignment Part, this court has available to it prior orders written by the undersigned in this action. The court notes that in its January 9, 1992 order the court quoted from one of the Wife’s affidavits submitted in connection with that motion, as follows: "56. However, we finally did go to Texas and my husband reluctantly signed Ryan’s final adoption papers.” Considering the content of the Wife’s August 31, 1992 affidavit submitted in connection with the present motion, it would appear that all coercion purportedly visited upon the Wife terminated when the Husband signed the child’s final adoption papers, and therefore, the act which the Wife wanted (finalization of the adoption), took place prior to her signing the 1983 agreement: "57. Eventually, after we returned from Texas and after constant harassment and threats from my husband, I did sign the [second] agreement. However, I never signed this agreement voluntarily and I only signed it because I was forced to by my husband.” Again, the Wife was represented by counsel throughout. In connection with any future motion, the Wife shall set forth in sufficient detail the overreaching claims within the narrow parameters of Christian (supra).

. Because defendant made a motion before this court for recusal of the undersigned, whereupon this court stayed further proceedings until that motion was submitted and determined, and that motion now having been denied, this court deems the present motion and cross motion to have been submitted on March 31, 1993, the day after the recusal motion was denied.

. In point of fact, such analysis avoids the obvious: it is merely a question of which spouse is favored by the law — as there is no viable marriage to enhance when one is allowed to keep quiet at the expense of the other.