### Alan Stalb v. Aglaia Stalb

[719 A.2d 421]

No. 96-537

Present: **Amestoy, C.J., Dooley, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned**

Opinion Filed September 4, 1998

*Kimberly B. Cheney* of *Cheney, Brock & Saudek, P.C.*, Montpelier, for Plaintiff-Appellant.

*John R. Durrance, Jr.,* of *Gaston, Durrance & Fairbanks*, Montpelier, for Defendant-Appellee.

**Dooley, J.** Defendant wife Aglaia Stalb raises several challenges to the trial court's decision to amend its final order reducing the amount that plaintiff husband Alan Stalb was required to pay wife in order to equalize the parties' investment in the Northfield Inn. Husband, in turn, argues that the mortgage loan buydown option in the corrected and amended notice of decision should be deleted, but that the rest of the order should be affirmed. We agree with husband and thus strike down the mortgage loan buydown option and affirm the corrected and amended notice of decision in all other respects.

## I.

Husband and wife are both in their fifties and were married before. They both worked in management positions at a New York aerospace company and earned similar salaries. The parties met in 1981, began living together in 1982 and married in 1984. The parties entered into an antenuptial agreement in the state of New York to settle property distribution issues if their relationship ended in death or divorce. The agreement stated that all jointly-held property would be divided equally between them and all property held in the individual name of either party would remain the property of that individual party. The agreement also provided that the terms of the agreement could be changed or modified only by a written instrument.

At the time of their marriage, the parties lived in a house owned partly by the wife and partly by her children. Both parties owned real property and pensions. On January 19, 1989, wife's job was abruptly terminated as a result of corporate downsizing. Wife looked extensively for similar work but was unable to find employment. As a result, the parties decided to invest in real estate which wife could manage, providing employment for her and potential retirement income for them both. On a trip to Vermont, the parties found an old Victorian house which they decided to purchase and develop into a bed and breakfast. In February of 1990, the parties purchased the property, took title in joint names, renamed it the Northfield Inn, and began renovating it. The parties agreed that the budget for the project would be $400,000 and that each would contribute one-half of the investment. The plan called for wife to live in Vermont and manage the inn, while husband would remain in New York, continue working at the same company, and commute to Vermont on the weekends to help with the operation of the inn.

The expenses for purchasing and renovating the inn went significantly over budget. In fact, wife contributed $302,670, husband contributed $189,651, and the parties obtained a mortgage loan for the inn through the Northfield Savings Bank for $166,256. Husband continued to make payments out of his income in order to cover expenses, but began to complain about wife's lack of accounting procedures and her extravagant spending on the inn. The parties' relationship began to deteriorate, and wife became secretive about the financial affairs of the inn.

In July of 1994, the parties separated, and husband filed for divorce. Husband stopped traveling to Vermont and providing money for expenses of the inn. In November of 1994, husband was notified

that his company was downsizing and he would be terminated in January. He has been unable to obtain similar employment since that time.

There are three judicial decisions and two master's reports in this case. The family court appointed a master to determine the fair market value of the parties' property, the expenses of the Northfield Inn, its profit or loss in 1995, and the contribution of each of the parties to the inn, and to make a recommendation regarding spousal maintenance. He did so in reports in August and December 1995. The family court upheld the antenuptial agreement and accepted the master's findings in May 1996. The family court issued its notice of decision, findings and conclusions on September 13, 1996. In its notice of decision, the court attempted to equitably divide the parties' property, giving effect to the antenuptial agreement. The trial court concluded, nevertheless, that it would be grossly inequitable for husband to receive a one-half share of the Northfield Inn when he had contributed only $189,651 and wife had contributed $302,671. The court held that it would be in contravention of the parties' "specific agreement to be equal investors in the Northfield Inn . . . to enforce the antenuptial agreement in a literal and technical manner" because husband would realize a windfall profit simply because he chose to pursue divorce before the parties had equalized their investment.

The court ordered husband to pay wife $113,020 to equalize the parties' investment in the inn and then awarded wife sole ownership of the inn. At the time of the divorce, the inn had a going concern value of $300,000, with a mortgage debt of $166,256 and an equity value of $133,744. The court allocated to husband the three jointly-owned Florida properties, which were valued at $139,002 and then ordered husband to pay wife $2,629 to equalize the property distribution. Thus, husband was required to pay wife a total of $115,649.

The court next considered wife's claim for spousal maintenance under 15 V.S.A. § 752(a)(1) and (2). The court determined that wife, as owner and manager of the inn, would derive from it an annual income of $12,433, including the value of the housing it provided her. The court recognized that this was not sufficient to meet her expenses, but found that the $800 monthly shortfall could be eradicated if husband's $115,649 payment to wife was applied to the principal of the mortgage on the inn. The court calculated that this payment would reduce the outstanding mortgage loan to $50,607 and the monthly payments from $1200 to $400. The reduction in the mortgage payments would bring wife's annual income to $22,003, an

amount sufficient to provide for her reasonable needs. On this basis, the court denied wife maintenance but required husband to pay wife's monthly health insurance premiums until she became eligible for Medicare.

At this point in the litigation, husband appealed the court's decision, arguing mainly that the antenuptial agreement prevented the court from finding a subsequent oral agreement existed with respect to the Northfield Inn. While the case was on appeal, the trial court decided that it had miscalculated the amount husband had to pay to equalize investments in the Northfield Inn, a point husband raised in his appeal. Upon leave of this Court, pursuant to V.R.C.P. 60(a), the family court issued an amended order reducing the amount husband owed wife from $115,649 to $59,139 and allowing wife to elect either (1) a mortgage buydown option whereby husband must pay $113,020 to the Northfield Savings Bank to reduce the mortgage on the Northfield Inn, and in turn wife must pay to husband the sum of $53,881, or (2) a payment from husband of $59,139 directly to her. Wife appealed this decision claiming that (1) the family court made changes that affected the substantive rights of the parties, beyond that authorized by Rule 60(a); (2) the antenuptial agreement between the parties is unconscionable and cannot be enforced under Vermont law; (3) husband's income is marital income, which should be split between the parties and cannot be used to pay for his investment share in the Northfield Inn; (4) the court found as fact that wife could refinance the Northfield Inn mortgage, and reduce the payment amount, with no evidence to support this finding; (5) the family court failed to make findings regarding maintenance and abused its discretion by lowering the amount of the property settlement without considering whether a rise in maintenance payments was necessary to offset increased expenses; and (6) the court abused its discretion in not reopening the evidence. Husband responded that the amended order should be affirmed as long as the mortgage buydown option is deleted. If the mortgage buydown option is not deleted or issues in the amended order are reversed, the husband returns to his original appeal issues: (1) the antenuptial agreement must be enforced; (2) oral modifications to the antenuptial agreement should not be enforced; (3) if oral modifications to the antenuptial agreement are given effect, then the parties' entire oral agreement regarding investment in wife's West Islip, New York, house and Northfield Inn should be enforced; and (4) the order requiring him to pay $10,000 of wife's attorney's fees should be vacated. We do not reach husband's

alternative arguments because we delete the mortgage buydown option and affirm the amended order in all other respects.

## II.

We start with the amendments the family court made to the final order while the case was on appeal because these are at the heart of wife's appeal issues. The amendments were based on a mistake the court made in equalizing the parties' investments in the Northfield Inn. The court found that wife had invested $113,020 more than husband. In its decision, the court stated that it would require husband to increase his investment in the inn by this amount, but in its order, it directed that husband pay $113,020 to wife. This order had the effect of increasing husband's investment in the inn while decreasing wife's investment, creating a disparity in favor of the wife.

The family court recognized its mistake, and reduced the amount husband had to pay wife on account of the inn, from $113,020 to $56,510. The court also recognized, however, that the payment reduction would reduce the income available to wife and attempted to ameliorate the impact by creating an option for wife to require husband to buy down the mortgage by $113,020, thereby reducing the mortgage payments, and to equalize the investment by a payment from wife to husband. Both parties oppose this buydown option, although for very different reasons. Because the corrected order reduces wife's property settlement by $56,510, with no offsetting increase in maintenance, she is now the appealing party, with husband defending the amended order as long as the buydown option is eliminated.

Wife's first argument is that the family court in its corrective order went beyond its limited power under Rule 60(a) and made changes that affect the substantial rights of the parties. See *Greenmoss Builders, Inc. v. Dunn & Bradstreet, Inc.*, 149 Vt. 365, 367, 543 A.2d 1320, 1322 (1988); *State v. Champlain Cable Corp.*, 147 Vt. 436, 439, 520 A.2d 596, 598-99 (1986); V.R.C.P. 60(a) (clerical mistakes and errors in judgments "arising from oversight or omission" may be corrected by court on its own initiative; if case is pending on appeal to the Supreme Court, leave of this Court is required); V.R.F.P. 4(a)(1) (Vermont Rules of Civil Procedure apply to divorce proceedings). In reviewing this argument, we note first that husband was continuing in his appeal to insist that the judgment was miscalculated as the family court later found, and his position was correct. Therefore, if the appeal had continued without the family court's request for a remand,

we would have been forced to reverse the judgment because of the error.

■ The family court may, during the appeal of a divorce action, grant a motion to modify the divorce judgment. V.R.F.P. 12(d). In any event, this Court remanded the case for the family court to reconsider the amount husband was directed to pay to equalize the property distribution. See 11 C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2873, at 431-32 (1995) (appellate court may remand to consider Rule 60(b) motion). Husband's appeal was in substance a request that the calculation error be corrected. Even if power to make the correction did not exist under Rule 60(a), it clearly existed under Rule 60(b)(1), and, thus, the court could modify the judgment under this rule. See *Greenmoss Builders, Inc.*, 149 Vt. at 367-68, 543 A.2d at 1322-23.

### III.

Wife's first argument on the merits is that the antenuptial agreement signed by the parties in the state of New York is unconscionable and cannot be enforced under Vermont law. In relevant part, the agreement provides that in case of divorce the marital property would be distributed in the following manner: (1) "[A]ll property held in the joint names of the parties shall be divided equally between them," and (2) "all property held in the individual name of either party, shall be the property of that individual party." Further, the agreement provides that the rights and obligations of the parties under the agreement "shall be construed according to the laws of the State of New York."

The antenuptial agreement is a contract: "Therefore, if the contract is valid where made, it will be interpreted here according to the law of the state of its making, so long as to do so will not violate the public policy of the State of Vermont." *Rogers v. Rogers*, 135 Vt. 111, 112, 373 A.2d 507, 509 (1977). Consequently, we begin by examining the validity of the antenuptial agreement under New York law.

The validity of antenuptial agreements in New York is governed by statute. The statute provides that such an antenuptial agreement pertaining to property is valid if certain formalities are met, including "provision for the ownership, division or distribution of separate and marital property." N.Y. Dom. Rel. Law § 236, Pt. B(3)(2) (McKinney 1986). The statute's coverage of property distribution is different from its coverage of maintenance. Antenuptial agreement provisions

relating to maintenance are valid only if "such terms were fair and reasonable at the time of the making of the agreement and are not unconscionable at the time of the entry of final judgment." *Id.* § 236, Pt. B(3)(3). Although the difference does not necessarily mean that property distribution provisions of antenuptial agreements are immune from challenge on fairness grounds, it does mean that judicial review of such provisions is necessarily limited. See *Zipes v. Zipes*, 599 N.Y.S.2d 941, 946-47 (Sup. Ct. 1993).

Generally, New York courts have held that antenuptial agreement provisions on distribution of property may be reviewed only under traditional equity standards of unconscionability or overreaching. See *Goldman v. Goldman*, 500 N.Y.S.2d 111, 113 (App. Div. 1986); *Pennise v. Pennise*, 466 N.Y.S.2d 631, 633-34 (Sup. Ct. 1983). Under this standard, the agreement will not be enforced if it shocks the conscience and confounds the judgment of any man of common sense, *Pennise*, 466 N.Y.S.2d at 633, or if no person in his or her senses would make it and no honest and fair person would accept it. *Clermont v. Clermont*, 603 N.Y.S.2d 923, 924 (App. Div. 1993).

Under any of the standards that have been adopted in New York, the antenuptial agreement in this case was valid when made. We reach this conclusion based on the facts found by the family court. At the time of the signing of the agreement, the parties had similar management positions, with similar salaries, and both owned substantial property. Although wife did not have separate counsel at that time, she was advised to obtain separate counsel by the firm preparing the agreement. She was knowledgeable about divorce issues, having litigated her first divorce extensively and with counsel. The agreement states that wife received adequate legal counsel or chose to waive it.

■ The agreement is not unfair on its face. It lists the separate property of each of the parties. As wife acknowledges, each party had assets of approximately equivalent value at the time of the agreement. The agreement states that the parties are aware of the equitable distribution law and that each has had the opportunity to make "complete financial inquiry of the other."

Even if the antenuptial agreement was valid when made under New York law, wife argues that it should not be enforced now under Vermont law. Although Vermont courts will generally enforce antenuptial agreements signed in other states, we have recognized that we will not enforce an agreement that contravenes the public policy of Vermont. See *Padova v. Padova*, 123 Vt. 125, 129, 183 A.2d 227, 230

(1962). Thus, in the absence of "fraud, duress or other unconscionable advantage" the agreement will be enforced according to its terms. *Rogers*, 135 Vt. at 114, 373 A.2d at 509.

Our leading case on the enforcement of antenuptial agreements is *Bassler v. Bassler*, 156 Vt. 353, 593 A.2d 82 (1991). In that case, we held that even if an antenuptial agreement is valid when made, we will not enforce it if, at the time of the divorce, it would leave one spouse a public charge, or close to it. See *id.* at 361, 593 A.2d at 87. We adopted the following language from *Marschall v. Marschall*, 477 A.2d 833, 840-41 (N.J. Super. Ct. 1984):

> Clearly there must be some level of "unconscionability" which would bar enforcement of an antenuptial agreement no matter what disclosure had been made. An agreement which would leave a spouse a public charge or close to it, or which would provide a standard of living far below that which was enjoyed both before and during the marriage would probably not be enforced by any court.

*Id.* at 361-62, 593 A.2d at 87. We refused to enforce an antenuptial agreement in *Bassler* because it denied the wife any interest in the husband's property and wife was receiving public assistance at the time of the divorce. *Id.* at 362, 593 A.2d at 88.

Wife's argument is that the divorce order will provide her a standard of living far below that realized during the marriage primarily because husband can keep his pension, which is more valuable than hers because he worked longer at the aerospace company. Under the amended order, however, wife has almost $500,000 in assets.[*] Of that, about $300,000 represents the value of her separate property. The remainder is the equity value of the Northfield Inn and the equalization payment husband must make to her. We do not believe that the property distribution places her in such a disadvantageous position that we can say that enforcement of the antenuptial agreement is unconscionable.

---

[*]The family court found that wife owed her children $102,538 because she used the equity of her New York home to provide part of the share of the capital for the Northfield Inn and the children were joint owners of the New York home. There is no written documentation for this debt, and it is unclear whether wife owes the children interest on it. In any event, the debt leaves wife's net property value at $400,000.

## IV.

Wife next contends that the family court improperly failed to enforce the oral agreement governing the purchase of the Northfield Inn. According to wife, the court should have required that husband's share come from his separate property rather than from his income. Wife's position is that this income was "marital income," that she was entitled to a 50% share of it in any event and, thus, that when husband used his income for his share of the purchase price 50% of that contribution should have been credited to her.

We agree that the court found that the oral agreement contemplated that husband's contribution to the price of the inn would come from the proceeds of the sale of property he owned separately. He was unable to sell his property, however, and the vast majority of his contribution came from his income.

■ Whether husband's contribution came from his income or his property is a distinction without a relevant difference. Although a spouse's income may be "marital income" in the sense that it is available to pay future maintenance, the other spouse has no right to the income prior to a maintenance award. Neither income capacity, nor the income itself, is property subject to equitable distribution. See *Wilcox v. Wilcox*, 365 N.E.2d 792, 795 (Ind. Ct. App. 1977); *Stern v. Stern*, 331 A.2d 257, 260 (N.J. 1975); cf. *Downs v. Downs*, 154 Vt. 161, 165-66, 574 A.2d 156, 158 (1990) (increased earning capacity caused by professional degree is not property subject to equitable division). Both our property distribution and our maintenance statute use the terms "property" and "income" in ways inconsistent with wife's position that income is a form of property. See 15 V.S.A. §§ 751(b)(3) (factor in dividing property is "source and amount of income of each of the parties"), 752(a)(1) (requirement for maintenance is that spouse seeking it "lacks sufficient income, property or both"). Indeed, if income were a form of marital property to be distributed between the parties, there would be no need for maintenance. Of course, to the extent that the income goes to purchase property that is "owned by either or both of the parties" at the time of the divorce, the property is subject to equitable distribution.

In all practical respects, husband's income was the equivalent of the proceeds of the sale of separate property, which was solely husband's under the antenuptial agreement. Prior to the maintenance order, wife had no specific claim on that income, and husband was free to use it to purchase his share of the Northfield Inn.

## V.

The next two issues relate to the failure of the court to award permanent maintenance to wife beyond payment for her health insurance. To put the issues in context, we first summarize the family court's reasoning.

The court recognized that the Northfield Inn income alone would not provide wife a reasonable living because a high percentage of the income is needed to pay the mortgage obligation. The court found that the inn was providing a net income of $12,433, including the amount of wife's living costs it covered. In its original opinion, however, it determined that if husband's property equalization payment of $115,649 were applied to reduce the mortgage and the mortgage were refinanced to reduce the payments, the annual income would increase to $22,000. Wife, moreover, would start receiving retirement income in three years, increasing her income eventually to $36,000 per year. Because this income would be sufficient to meet wife's reasonable needs except for medical insurance, the court denied permanent maintenance except for payment of wife's medical insurance. The court held that it was fair to require husband to pay for wife's medical insurance because the parties had originally agreed she would run the inn without the benefit of medical insurance as usually provided by an employer. The court did award temporary maintenance of $800 per month until husband made the property equalization payment. Wife did not appeal the maintenance decision.

The amended decision reduced the property equalization payment to $59,139, with the buydown alternative that would require the husband to pay the bank $113,020 and receive $53,881 from the wife. Despite the reduced payment, the court found that the need for maintenance remained the same because the mortgage would be reduced as in the original order and wife could make the $53,881 payment to husband from stocks, a certificate of deposit and savings that were not being used for ongoing living expenses.

In her appeal, wife challenges the court's conclusion that the mortgage could be refinanced to reduce the payments as unsupported by any evidence. More broadly, she challenges the decision as unsupported by any findings on the standard of living during the marriage and any analysis of the statutory maintenance factors, 15 V.S.A. § 752(b). We begin with the latter challenge.

At the outset, we note that this was not a classic case for an award of significant permanent maintenance. Cf. *Soutiere v. Soutiere*, 163 Vt. 265, 272, 657 A.2d 206, 210 (1995); *Strauss v. Strauss*, 160 Vt. 335,

340-42, 628 A.2d 552, 554-55 (1993); *Klein v. Klein*, 150 Vt. 466, 474, 555 A.2d 382, 387 (1988). It was a second marriage for each, the duration was not long, and there were no children. Both parties initially had good jobs with similar incomes, and both have similar qualifications for future earnings. The parties had similar roles during the marriage. Although the issue is characterized as maintenance, wife really seeks a permanent subsidy of a business that fails to produce income commensurate with the capital investment and the work effort.

Wife argues that the family court failed to find the standard of living during the marriage, failed to consider the interrelationship between the property award, particularly its reduction, and the need for maintenance, and failed to equalize the parties' income. We do not agree that the court failed to find the standard of living during the marriage. There were extensive findings about how the parties lived and the relationship between their finances and their lifestyle. Indeed, the $800 per month temporary maintenance payment was intended to continue husband's historic contribution to wife's expenses to maintain her income. The marriage actually went through three different standard of living periods. At first, both husband and wife were earning relatively high incomes from their aerospace company jobs and could live well. Then, wife lost her job, and eventually the parties' lifestyle centered almost exclusively around the operation of the inn. Finally, husband lost his job and had only unemployment compensation income.

Where the parties could not maintain the lifestyle of earlier times because of the income reductions, we do not see the need for precise specification of the living standard, even if such precision is ever required. See *Kohut v. Kohut*, 164 Vt. 40, 43-44, 663 A.2d 942, 944 (1995). Moreover, the standard of living during the marriage is one factor in determining the amount of maintenance, see 15 V.S.A. § 752(b)(3), and there were other significant factors in this case. For example, we emphasized in *Delozier v. Delozier*, 161 Vt. 377, 382-83, 640 A.2d 55, 58 (1994), that "[t]he longer the marriage, the more closely reasonable needs should be measured by the standard of living established during the marriage." This was a relatively short marriage. See *id.* at 383, 640 A.2d at 58 (although there is no precise point at which marriage becomes long-term, awards of permanent maintenance are made in marriages of fifteen years or more).

Also, contrary to wife's argument, the court did consider the interrelationship between the property award and the need for

maintenance; indeed, the whole justification for the decision was based on this interrelationship. Although the amended order did result in wife receiving less than the original order, it was a correction of a calculation error, not a decision to change the property distribution to disadvantage wife. We have previously stated that property should often be viewed as a nest egg for retirement, and a spouse cannot be put in the position of selling off property to meet basic living expenses, see *Klein*, 150 Vt. at 475, 555 A.2d at 388, but these general principles are not offended here. Wife was awarded her nest egg for retirement, the Northfield Inn. As a result, she was property-rich and income-poor. Much of her property, other than the inn, was not available as income for living expenses. In these circumstances, it was not unreasonable to require her to use her other property to reduce her debt load on the inn and bring her income up in relation to her needs.

Finally, we have not held that family courts must equalize income in every case. In fact, we have held that "[a]wards based only upon the single criterion of the payor's income . . . would rarely be acceptable." *Delozier*, 161 Vt. at 385, 640 A.2d at 59. Here, other factors, such as the length of the marriage and the lack of any compensation justification, suggest that income equalization is not appropriate. See *id.* at 386, 640 A.2d at 60.

■ The family court has broad discretion in fashioning a maintenance award. See *Tracey v. Gaboriault*, 166 Vt. 269, 277, 691 A.2d 1056, 1061 (1997). We will not overturn an award unless it has no reasonable basis to support it. See *Soutiere*, 163 Vt. at 272, 657 A.2d at 210. We find a reasonable basis in this case for limiting permanent maintenance to the cost of health insurance. There was no abuse of discretion.

We also think the court's discretion is an answer to wife's complaint that there was no evidence that she could refinance the mortgage on the inn after paying down the principal. It was not the court's obligation to come up with an exact scenario that would allow wife to remain in the inn and make sufficient income from it. It may be that the investment in the inn needs to be moved elsewhere to make sufficient income. The point is that wife received enough investment property to allow her to generate an income, along with her retirement benefits, to meet her reasonable needs in the future.

## VI.

Wife's final appeal argument is that the family court should have granted a post-judgment motion to reopen the evidence or amend the judgment. The motion offered a letter from the bank to show that wife had not made extra payments of mortgage principal, as found by the court, and claimed that husband had improperly attempted to obtain certain insurance proceeds after the judgment was issued.

■ The issues raised by the motion were collateral and did not go to the rationale for the family court's decision. As to the bank evidence, there was no showing why it could not have been offered during the trial. See V.R.C.P. 60(b)(2) (relief from judgment for newly discovered evidence may be granted if movant shows the evidence could not be discovered prior to trial through the exercise of due diligence); *Olde & Co. v. Boudreau*, 150 Vt. 321, 324, 552 A.2d 793, 795 (1988) (failure to produce evidence not grounds for relief under Rule 60(b)). As to the evidence of husband's post-judgment conduct, the family court was in the best position to evaluate its significance to its conclusions and judgment. The family court has wide discretion in acting on a Rule 60(b) motion. See *Slansky v. Slansky*, 150 Vt. 627, 629, 556 A.2d 94, 95 (1988). There was no abuse of that discretion.

Finally, husband cross-appeals, contesting the mortgage buydown option. He claims that he would have to liquidate $180,000 in assets to make the payment to the bank because he would pay about $70,000 in income taxes because of the liquidation. He argues that this is an unnecessary and punitive requirement. Wife has not opposed this argument.

■ We agree that the option unnecessarily creates a substantial tax obligation. The same result as the buydown option would be accomplished if wife takes husband's $59,139 payment, adds to it the $53,881 wife would have to pay husband under the buydown option, and pays the sum to the bank to reduce the mortgage indebtedness. Since the obligation to pay the bank is entirely controlled by wife, it makes no sense to require a method that requires the liquidation of more assets than necessary. Accordingly, we strike the buydown option from the final judgment.

*Section 6 of the judgment order is amended to read as follows:*

*Plaintiff shall pay the sum of $59,139 to defendant within 30 days from the date of this order. Interest at the legal rate shall accrue on any sums not paid in accordance with this*

*order. Upon payment of the sum required by this paragraph, and paragraphs 7 and 9 below, defendant shall quitclaim her interest to the plaintiff in properties awarded to him. Until payment is made, that property shall secure plaintiff's interest to the defendant.*

*The amended judgment order is affirmed in all other respects.*